In re Jonathan **COOPER** and Steven **Lynn,** Petitioners.

No. 87–1400 Orig.

United States Court of Appeals, First Circuit.

Submitted May 26, 1987.
Decided June 9, 1987.

Norman S. Zalkind, Kimberly Homan and Zalkind, Sheketoff, Homan & Rodriguez on petition for writ of mandamus for petitioner Jonathan Cooper.

John Wall, David Shaughnessy and Cullen & Wall on petition for writ of mandamus for petitioner Steven Lynn.

Kenneth P. Madden, Asst. U.S. Atty., and Lincoln C. Almond, U.S. Atty., on memorandum in support of opposition to writ of mandamus.

Before BOWNES, TORRUELLA and SELYA, Circuit Judges.

PER CURIAM.

Petitioners seek a writ of mandamus compelling Judge Lagueux to disqualify himself from presiding over their criminal trial. Denials of motions to disqualify are reviewable via mandamus, *In re United States*, 666 F.2d 690, 694–695 (1st Cir.1981); *In re Union Leader Corporation*, 292 F.2d 381, 384 (1st Cir.1961), *cert. denied*, 368 U.S. 927, 82 S.Ct. 361, 7 L.Ed.2d 190 (1961), and relief will be accorded when petitioners show a "clear and indisputable" right to the writ. In passing on such applications, we ask not whether this court would have decided as did the trial court, but whether the trial court decision "cannot be defended as a rational conclusion supported by a reasonable reading of the record." *In re United States*, 666 F.2d at 695.

We recount the background. Petitioners Cooper and Lynn have been indicted for drug offenses. A principal witness against them is Mitchell Fried, who has already been sentenced and has agreed to cooperate with the government. In January 1987, Cooper and Lynn moved to dismiss their indictments or, in the alternative, to bar Fried from testifying on the ground that Fried, first through Rhode Island counsel Walter Stone and then personally, offered to alter his testimony in exchange for payment. At the time the motion was filed, Lynn was represented by Andrew Good of the firm of Silverglate, Gertner, Baker, Fine & Good, and Cooper was represented by Norman Zalkind of a different firm. Affidavits from Good and Zalkind, which contained serious allegations of wrongdoing, accompanied the motion to dismiss.

Four days of evidentiary hearings, which to some extent pitted the credibility of Rhode Island Attorney Stone against that of Massachusetts Attorney Good and others, were held. We recount some of the evidence.

Good became counsel to Lynn in the fall of 1986. He arranged with Edward Gerstein, a Rhode Island attorney, to serve as Lynn's local counsel. Gerstein rented office space from Walter Stone, Fried's attorney, and Good asked Gerstein whether it could be arranged for defense counsel to

interview Fried. Gerstein testified that he checked with Stone, and Stone, after checking with Fried, said Fried had agreed to an interview provided 1) Fried's attorney would be present, 2) Fried's attorneys' fees incurred as a result of the interview were paid, and 3) Fried could meet alone with Lynn first. Gerstein stated that Fried could be helpful to defendants, but did not know the particulars. Good objected to a private one on one meeting because, absent the meeting, he was not sure Fried would be able to identify Lynn and he did not want Lynn in a position where Fried would be able to testify that Lynn had made admissions or had solicited a bribe. Discussions ensued about various means to handle these matters (such as Fried and Lynn communicating through notes), but no resolution was reached and a dinner meeting was arranged.

On the evening of November 25, 1986, Good, Judith Mizner (a partner at Good's firm), Zalkind, Kimberly Homan (a partner at Zalkind's firm), and Stone met at a restaurant. According to Good, Stone told him that Fried could be a very good witness for the government as he had been at the last trial or he could come into court poorly dressed and be a very bad witness; that Fried was angry at Cooper and Lynn and felt they had been the conspiracy's undoing; that Fried was angry at the government because of the sentence he had received and felt he was the only one going to jail without any drug proceeds while more culpable people had gotten away; that Fried had made a photographic identification but if the private Fried-Lynn meeting worked out Fried could handle the identification and there would be no identification; that Fried would be a good government witness if the private meeting did not take place; and that Stone did not know and did not want to know what would take place at the private meeting.

Kimberly Homan (co-counsel along with Zalkind for Cooper) testified similarly concerning the dinner meeting: Stone had repeated the refrain several times that Fried could be very helpful to Cooper and Lynn or he could hurt them badly; it all depended on whether the meeting took place, and

absent the private meeting, Fried would not authorize Stone to give any information. She added that in an earlier trial Fried had interchanged Cooper's and Lynn's first names and had indicated difficulty differentiating one from the other. Stone's reply to whether Fried still had that difficulty was, again, that it would depend on whether the meeting took place. Whether Fried hurt the government or the clients depended on the circumstances at the time of trial. Although at no time did Stone mention the word bribe or payoff, Homan understood the good witness/bad witness talk plus the discussion that Fried could be helpful if the private meeting took place to mean that Fried was prepared to alter his testimony.

Stone's account was as follows. He had talked to Fried and Fried had agreed to an interview provided that he could meet defendants face to face ahead of time and that any time Stone spent on the matter would be paid by defendants. Fried also told Stone that he had picked out one of the defendants in a photo array—Stone did not know whether it was Cooper or Lynn—and that the other one he had not been sure of because the picture was old. Stone did not want a private meeting to take place because he knew Fried was angry at Cooper and Lynn and Stone did not want physical violence. Stone told the lawyers at the dinner meeting there was no need for an interview since he (Stone) could give them the pertinent information, and he then recounted that Fried had had trouble with the photographic identification. The lawyers persisted in their request for a private interview and asked what Fried was like. Stone then described three different postures he had seen: 1) dressed like a typical drug dealer, 2) grubby and a horrible witness at a suppression hearing, and 3) well groomed, articulate, looking like a professor and making an excellent government witness at another conspirator's trial, which had taken place before Fried was sentenced. Now, Fried, due to report to jail soon, was angry at the government and angry at Cooper and Lynn, and Stone just did not know how he would be at trial or

whether he would make an in court identification. At this point, he said, counsel started asking hypotheticals such as if there were no interview would Fried be a good witness and if there were an interview would he be a good witness. Stone said he never stated or implied Fried would repudiate an identification.

Believing that if a private meeting between Fried and Lynn were to take place, Fried would attempt extortion, defense counsel decided to try to catch Fried in the act. On December 1, 1986, Good called Stone and said he would really like to interview Fried and if the private meeting were a precondition to an interview, then Good was amenable and had advised Lynn what would and would not be proper at such a private meeting. Good then gave Stone a number in New York (in New York, unlike in Massachusetts, Lynn could lawfully record any conversation he had with Fried) where Lynn could be reached the next morning at 9:00 a.m. Stone relayed the number to Fried, but, according to Stone, advised him not to make the call. Fried made the call (which Lynn with the help of a private investigator recorded) and Fried and Lynn agreed to meet that evening at Logan airport. Immediately after Lynn described the clothing he would be wearing so that Fried could recognize him, Fried said "Why don't you pack a bag too?" a reference counsel interpreted to mean that Lynn should bring money for a pay off.

After the call, Good and Silverglate went to the United States Attorney's Office, explained what they thought was transpiring, and requested that Lynn be fitted with a recorder for the meeting. This was done, and Lynn and some agents proceeded to the airport. At the airport, Fried approached Lynn and handed him a pad of paper. According to Lynn, Fried wrote "I can help you or I can hurt you." Lynn asked Fried what he wanted, and Fried wrote "$250,000 plus five years interest." (These notes were not produced at the hearing. According to Lynn, Fried tore them up but retained the pieces.) Lynn asked if that were a real figure and Fried replied on the tape, "As far as I am concerned if your people in New York had done what they were supposed to do," a reference which could be construed to refer to the proceeds Fried believed himself entitled to had the drug conspiracy gone as planned. Lynn asked if 50 or 100 would be satisfactory, said he'd see what he could do, and asked Fried for a time and place. Fried was due to report to jail on December 4 and replied "same place at eleven o'clock tomorrow [December 3]."

Lynn was fitted out the next day again with a recording device and equipped with a brief case which he would represent as containing the money, but due to various delays in transcribing and reviewing the previous night's tape, he and the agents did not arrive at the airport until 11:20 or so. Fried was not then there (Fried reported to the government that he had been there at 11:00) and no meeting took place. Defendants felt the government was responsible for the delay in arriving at the airport and argued they had been deprived through the government's negligence or inefficiency of crucial evidence, namely, catching Fried in the act of extorting Lynn.

Lynn testified that the first time the $250,000 figure had been mentioned was at his December 2, 1986 meeting with Fried at the airport and that it was Fried who came up with that figure. An FBI agent testified, however, that prior to the airport meeting while fitting Lynn out, there had been discussion about what Fried would demand. One agent guessed $10,000, another $50,000. Lynn said both were too low; it would be $250,000.

On April 10, 1987, several weeks after the evidentiary hearing had ended, Judge Lagueux called counsel to his courtroom to announce his decision. As petitioners claim the tone of this opinion evidences Judge Lagueux's bias towards them or their counsel, we recount the findings at some length.

To begin, Judge Lagueux found most telling the agent's testimony that Lynn had predicted Fried's demand would be $250,000. The judge found that Fried had in fact made a demand at the airport for $250,000 plus five years interest, but that this was not an extortion demand or offer

to change testimony. Rather, the $250,000 represented Fried's—and, in view of Lynn's prediction, also Lynn's—understanding of the proceeds due Fried for the drug transactions in 1981. He concluded that Good all along suspected that were a face to face meeting arranged, Fried would demand payment of his share of the drug proceeds. Therefore, Good, in an effort to destroy Fried's credibility as a witness, decided "to hatch his little scheme and to manipulate the situation." He would try to record the demand for payment of drug money so that it would sound like Fried was demanding money in exchange for altering his testimony. In furtherance of his plan, Good taped his side of some conversations with the Rhode Island attorneys without telling them, a circumstance Judge Lagueux felt indicated that "Good is a clever manipulator who cannot be completely trusted even by his own colleagues." Consequently, Good's testimony about his motive would "be viewed with a good deal of skepticism."

As for the dinner meeting, Judge Lagueux found as follows:

"Good made certain that there were other lawyers at the meeting ... Harvey Silverglate, Good's law partner, and a self-proclaimed expert on greed,[1] who was in on the planning stages for this bushwacking of Stone, decided not to attend because it would be overkill. Good had suitably briefed the other attorneys about his suspicions that Fried would be demanding money from Lynn and that Stone would probably be relaying that kind of information. Therefore, the fearsome foursome [Good, Zalkind, Mizner, Homan] attended the meeting with a predisposition to misinterpret everything that Stone said. I believe

Stone's version of what occurred at that meeting. I believe that Stone did not want his client to have a private meeting with Lynn because he thought that Fried was so angry with Lynn and Cooper that he might well physically accost either one.... Therefore, Stone was trying to be forthright in his assessment of Fried as a witness so that an interview, and thus a one-on-one meeting with Lynn and Cooper, would be unnecessary. Stone pointed out how unpredictable Fried was and cited instances. He was asked hypothetical questions which were confusing and which were framed in such a way as to cause any answer by Stone to create the impression that Fried was going to demand money in exchange for changing his testimony."

Thereafter, "Good, with the help of his name-dropping [2] partner Silverglate, tried to set up [the] sting operation" by first approaching a federal judge for surveillance authority and by then involving "the United States Attorneys Office to do their dirty work for them." The office cooperated and the surveillance took place. Although Lynn and the agents arrived late for the second airport meeting and consequently contact was not made that day with Fried, Judge Lagueux concluded sanctions against the government were not warranted. In the first place, the government had no duty to conduct a sting operation, and, in any event, there was no intentional or bad faith misconduct or negligence. Rather, the agents had acted "reasonably, expeditiously, and in accordance with Government policy in all respects."

Judge Lagueux then proceeded to analyze a number of cases, a matter we need not go into. In short, he concluded the

---

**1.** The reference to greed derives from the following. Silverglate and a DEA agent discussed whether Fried was likely to show up for the second airport meeting. The agent was doubtful. Silverglate was not, explaining he thought Fried was desperate and "greed can make people do ... bizarre [things] sometimes...."

**2.** The reference to name dropping derived from the following. Silverglate was asked about defense counsels' communications with Judge Woodlock concerning obtaining authorization

for electronic surveillance. Silverglate responded: "Now I was not the one to speak with Judge Woodlock. I was the one who tried to dial up Judge Nelson. I know Judge Nelson. Judge Nelson married me and my wife, and I had some relationship with him. I felt comfortable talking to him, but he was not in." When later questioned during the hearing on the motion to recuse about having described Silverglate as a name dropper, Judge Lagueux referred to the above testimony.

failure to get Lynn to the airport on time was not tantamount to government destruction of exculpatory evidence or other misconduct warranting dismissal of the indictment. Nor did he conclude that Fried was so biased or so prone to perjury that due process required exclusion of his testimony. Rather, credibility would be for the jury to assess.

On April 30, 1987, twenty days after the oral bench opinion had been delivered, Cooper, represented by Zalkind and Homan, and Lynn, represented by new counsel as Good (and his firm) had withdrawn in order to be able to testify on Lynn's behalf at the criminal trial, filed a motion pursuant to 28 U.S.C. § 144, and 28 U.S.C. § 455(a) to disqualify Judge Lagueux from all further proceedings. Zalkind filed an affidavit stating grounds which he asserted evidenced either actual "personal bias or prejudice," within the meaning of 28 U.S.C. § 144, against defendants or circumstances under which Judge Lagueux's "impartiality might reasonably be questioned" within the meaning of 28 U.S.C. § 455(a). We will address each ground, as supplemented by petitioners' memoranda, in turn, but first we start with some general observations.

■ Under 28 U.S.C. § 455(a), a judge may disqualify himself "in any proceeding in which his impartiality might reasonably be questioned." Under 28 U.S.C. § 144, a judge must disqualify himself, "whenever a *party* to any proceeding ... makes a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party...." (Emphasis added). The affidavit must state the reasons for the belief that bias or prejudice exists and "be accompanied by a certificate of counsel stating that it is made in good faith." Furthermore, the alleged bias and prejudice, to be disqualifying under § 144, must be personal and it must stem from an extrajudicial source. Adverse attitudes toward a party or witness formed on the basis of the evidence before the court do not constitute disqualifying bias and prejudice. *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698,

1710, 16 L.Ed.2d 778 (1966). While § 455(a) is not quite as strict as § 144 in mandating an extrajudicial source of prejudice, *see, e.g., United States v. Cepeda Penes*, 577 F.2d 754, 758 (1st Cir.1978), (it is not the case that a judge's participation in prior proceedings in any given case can *never* form the basis for a finding of bias) (emphasis in original), mere disagreement over the state of the law or the correctness of the judge's factual findings will not suffice. *Id.*, at 758; *Blizard v. Frechette*, 601 F.2d 1217, 1220–1222 (1st Cir.1979). It is a judge's job to make credibility determinations, and when he does so, he does not thereby become subject, legitimately, to charges of bias.

In the present case, no *party* filed an affidavit stating Judge Lagueux was biased either for or against a *party*. Rather, the affidavit was filed by an attorney, Zalkind, alleging bias against various attorneys. No grounds for believing Judge Lagueux was biased personally against either Cooper or Lynn were stated. Rather, the gist of the affidavit was that Judge Lagueux's allegedly prejudical rancor against the attorneys would be transferred to the defendants and prevent a fair trial. And, as will be discussed, the alleged bases for prejudice against the attorneys stated in the affidavit stemmed from the attorneys' disagreement with the findings and tone of the opinion denying the motion to dismiss the indictment. Because we find the affidavit insufficient on its face, we need not dwell on the fact that it was not filed by a party.

■ Generally, clashes between court and counsel are an insufficient basis for disqualification under either statute. As the Eighth Circuit has explained,

"The term 'party' as used in [§ 144] does not include counsel as such.... Antipathy to an attorney is insufficient grounds for disqualification of a judge because it is not indicative of extrajudicial bias against a 'party.' ...

"Similarly, under 28 U.S.C. § 455(a), which requires that a federal judge disqualify himself or herself 'in any proceeding in which his [or her] impartiality

might reasonably be questioned,' a controversy between a trial judge and an attorney for parties to an action would not require disqualification of the judge in absence of showing of bias or personal prejudice to the parties."

*Gilbert v. City of Little Rock,* 722 F.2d 1390, 1398–1399 (8th Cir.1983), *cert. denied,* 466 U.S. 972, 104 S.Ct. 2347, 80 L.Ed.2d 820 (1984). In that case, the trial judge in an unrelated case had entered an order recusing herself in all cases involving one Attorney Walker or his firm because of remarks Walker had made to her. Although Walker and one of his associates were expected to be witnesses in the case presently before the judge, the judge refused to recuse herself, and the Eighth Circuit found no abuse of discretion. *See also United States v. Kelley,* 712 F.2d 884 (1st Cir.1983) (judge's authorization of a wire tap order against counsel on the ground that there was probable cause to believe counsel was obstructing justice did not disqualify judge from presiding over criminal proceedings at which the defendant was represented by the wiretapped counsel); *United States v. Cook,* 400 F.2d 877 (4th Cir.1968), *cert. denied,* 393 U.S. 1100, 89 S.Ct. 898, 21 L.Ed.2d 792 (1969) (that judge, who sat on proceedings which culminated in the suspension of defendant's counsel because of counsel's unethical behavior in conducting defendant's defense, thereafter presided at defendant's trial did not deny defendant a fair trial; "[a] judge is presumed not to confuse the evidence in one case with that in another," and therefore the judge was not disqualified from presiding at defendant's trial); *Honneus v. United States,* 425 F.Supp. 164 (D.Mass.1977) (judge's referral of trial counsel to Board of Bar Overseers because of counsel's unprofessional conduct during defendant's trial did not require judge to recuse himself from presiding over defendant's motion to vacate his conviction where defendant was represented by new counsel in the post conviction proceeding).

It is true that occasionally exceptional circumstances do arise where a judge's attitude toward a particular attorney is so hostile that the judge's impartiality toward the client may reasonably be questioned. *See Bell v. Chandler,* 569 F.2d 556 (10th Cir.1978) (judge's disbarment of a United States Attorney and five Assistant United States Attorneys in earlier proceedings which had been procedurally deficient and wholly unjustified demonstrated unlikelihood that the United States could obtain a fair trial). Such situations are rare, and, as will be discussed, this case is not one of them.

■ We turn then to the allegations of the Zalkind affidavit.

1. The April 10, 1987 bench opinion represented a judicial predetermination of a lack of honesty and credibility on the part of Homan and Zalkind, counsel for Cooper.

In the course of his opinion, Judge Lagueux credited Stone and discredited Good. As Homan's testimony and Zalkind's affidavit in support of the motion to dismiss the indictment had generally accorded with Good's account, the opinion, by necessary implication, cast Homan's and Zalkind's credibility in doubt, counsel contended. In particular, Zalkind pointed to the finding that he and Homan had attended the dinner meeting "predisposed to misinterpret everything that Stone said." The judge made a credibility determination based on the evidence before him. That is not a basis for claiming extrajudicial or personal bias. *Blizard v. Frechette,* 601 F.2d at 1220–1222. In any event, the finding does not reasonably give rise to any appearance of personal bias or fundamental unworthiness of belief. To the contrary, it made allowances for Zalkind and Homan by recognizing that, as they had not been direct participants in all the conversations Good had had with Gerstein and Stone, they had been dependent upon Good for information and consequently had been influenced by what he had told them.

2. Delivery of the opinion from the bench had the calculated effect to maximize prejudicial press coverage and publicly humiliate counsel.

■ Serious allegations of wrongdong, involving members of the bar, had been

made. The matter obviously was of public interest, and it was important to resolve the allegations promptly. At the conclusion of the evidentiary hearings, the judge advised the parties that he might deliver his opinion orally. No one objected. That he then issued an oral opinion rather than a written one (a written one might have taken several more days to process) is inconsequential. The press and public were entitled to know the content of the opinion, and we see no impropriety in the manner the opinion was delivered.

3. The court's opinion constituted a gratuitous personal attack on counsel for defendants, particularly Good and Silverglate.

4. Judge Lagueux's resolution of defendants' motion to dismiss, which entailed allegations of wrongdoing made by Massachusetts attorneys against Rhode Island attorneys, was influenced by the judge's involvement in Professor Dershowitz's criticism of the Rhode Island judicial system (another controversy concerning claims by a Boston attorney against members of the Rhode Island bar as well as judiciary).

We deal with these together.

Attached to Zalkind's affidavit were newspaper articles discussing charges of impropriety Professor Dershowitz had made against the Rhode Island legal community as a result of his involvement in the Von Bulow case and Judge Lagueux's response thereto. Judge Lagueux was quoted as making derogatory comments about Dershowitz. Thereafter, Harvey Silverglate, in his capacity as counsel for Dershowitz, wrote to Judge Lagueux asking whether the papers had accurately quoted him, strongly criticized the judge for having made such statements, and invited him to challenge Dershowitz to a debate. The Zalkind affidavit continued as follows:

"15. My belief that your Honor's response to this matter is related to the earlier episode involving Mr. Silverglate and Prof. Dershowitz is strengthened by the fact that Mr. Silverglate, who appeared at the evidentiary hearing, was mentioned by name only twice in the bench opinion and each time a wholly gratuitous perjorative appellation was appended to his name, i.e. 'a self-proclaimed expert on greed,' '[Good's] name-dropping partner.'

"16. It is my belief that only such extraneous influences can explain this Court's construction from the record of evidence of a premeditated manipulative fraud crafted by Good and Silverglate, which encompassed, in this Court's analysis, the misrepresentation of events to counsel for co-defendant Cooper, i.e. myself and Ms. Homan, in order to dupe us into supporting the scheme, and, most incredibly, brazenly misstating events first to a federal judge and then to the United States Attorney in order to fool them into 'doing his dirty work' for him. I believe such an analysis of events to be clearly erroneous, not supported by the record, and a wholly convincing indicator of this court's pervasive and irremediable bias where criticism of members of the Rhode Island bar is concerned in general and in particular, when the issue is raised by Massachusetts attorneys associated in this Court's mind with Prof. Dershowitz's earlier criticism.

.    .    .    .    .

"18. Notwithstanding, Mr. Good's withdrawal as counsel ..., I believe that a disqualifying lack of impartiality remains, in that your Honor's obvious hostility extended to all counsel and by implication to the defendants. Further ... it is anticipated that [Good] and other members of his firm may be called as defense witnesses ... and that the emotionally charged nature of this issue for this Court and this Court's biased prejudgment of matters relating to Fried and the construction to be given to his actions in December, 1986, will fatally prejudice the defendant's right to a fair trial and to due process of law."

In other words, stripped to essentials, it would seem to be that Zalkind saw no support in the record for the court's findings, hence concluded the findings were influenced by the Dershowitz affair, and therefore contended the court must have been biased by extraneous influences.

We do not now address whether the ruling on the motion to dismiss the indictment was correct. That issue, we assume, will come before us on appeal in the event defendants are convicted, and we do not prejudge that matter now. Nor do we address whether the subsidiary findings were clearly erroneous, for the mere fact that a judge errs or makes clearly erroneous findings would not be indicative of bias. We only now determine, after having reviewed the entire transcript, that the findings were not so beyond the pale as to be suggestive of bias. We see no need to state our conclusions at length or to deal with each of petitioners' attacks on the various findings. In short, petitioners' position seems to be essentially this: Fried made a demand for money and Lynn manifested a willingness to pay what he could. Obviously Lynn was not making a charitable donation to a friend about to depart for jail, but rather expected something in return. Hence, implicit in the Lynn-Fried dealings was a promise by Fried to testify favorably to Lynn if Lynn delivered enough money and/or a threat to do the opposite if he did not. In other words, Fried was attempting extortion. Any other interpretation is so devoid of record support and defiant of common sense that it must be the product of bias.

We are not convinced. Rather, the record is susceptible to the following interpretation. Lynn and his counsel—rather than Fried—were the ones clamoring for a meeting. Fried, believing himself entitled to payment for past services rendered, would take advantage of whatever befell from Lynn's agitation without committing himself to any quid pro quo.

■ In view of the conflicts among the attorneys' testimony, credibility was necessarily a matter in issue which the judge had to decide. That he resolved contested matters adversely to Good does not establish bias either towards Good or towards defendants. Indeed, we rejected a similar argument in *United States v. Kelley*, 712 F.2d 884 (1st Cir.1983). There, unknown to defendant, a year earlier the trial judge, finding probable cause to believe defense counsel was involved in a conspiracy to obstruct justice, had authorized electronic interception of defense counsel's phone. Thereafter, the judge found defendant guilty in a jury waived trial. Noting that a judge's negative determination regarding a *party's* credibility in a prior proceeding did not require disqualification, we concluded that a prior ruling adverse to a party's *counsel* similarly would not require disqualification. *Kelley*, 712 F.2d at 890. It is a judge's job to make credibility determinations and inferences of partiality do not arise simply because the job is performed. Nor are judges required to mince words.

■ With respect to the tenor of the opinion concerning Good, it would appear that Judge Lagueux believes Good went beyond the bounds of permissible advocacy, that rather than myopically casting ambiguities in the light most favorable to Lynn, Good instead should have been more objective and made fuller disclosure to those with whom he consulted before levelling major charges of impropriety against another counsel. We do not say whether such an assessment is right or wrong. That is not the question. It is enough that the assessment derives from the record of the proceedings before the judge. A court's disagreement—even one strongly stated—with *counsel* over the propriety of trial tactics does not reflect an attitude of personal bias against the *client*. See *Davis v. Board of School Commissioners of Mobile County*, 517 F.2d 1044, 1050–1052 (5th Cir.1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976) (controversy between lawyer and judge over the propriety of the lawyer's use of a class action device did not suggest bias against the client).

■ As for the references to Silverglate as a name dropper and self proclaimed authority on greed, it is true that Silverglate's testimony was rather peripheral to the controversy and that the appellations were unnecessary and did not clarify the fact finding process or advance the reasoning of the opinion. But these appellations, along with the remarks directed at Good, are far from manifesting so virulent an

attitude towards an attorney as to reasonably give rise to a question of partiality against the defendants personally. The appellations were not devoid of record support. *See* notes one and two. Good and Silverglate no longer represent either defendant. Even if they are witnesses at trial, defendants are entitled to have a jury—rather than the trial judge—assess their credibility. *See Gilbert v. City of Little Rock*, 722 F.2d at 1398–1399 (that judge felt required to recuse herself from presiding on any case tried by a particular lawyer or his firm, did not require her to recuse herself in a case where the lawyer was an expected witness). Any bias manifested at trial would be reviewable on appeal.

Last, in support of the petition for writ of mandamus, petitioners point to 1) Judge Lagueux's remarks in denying the motion for recusal and 2) actions taken on May 19, 1987. We recount the background.

In his oral opinion denying the motion to recuse, Judge Lagueux, after concluding that there was "no fact on this record which would lead a reasonable person to believe [Judge Lagueux is] prejudiced in this case against Mr. Zalkind, against Ms. Homan, or against the defendants Cooper and Lynn," continued as follows:

> "The attempt of Mr. Zalkind through an affidavit to bring in extraneous matter [the Dershowitz affair] is both disingenuous and may well be a violation of ethical standards. That affidavit is false ... in attributing to me a personal bias and prejudice against certain people because of a public controversy that I had with Alan Dershowitz last spring ...
>
> "The [Zalkind] affidavit states that it is made in good faith. That is an assertion made under oath. I am satisfied that it is not made in good faith. I am satisfied that the affidavit is false in those particulars that I have mentioned, is totally irrelevant to the case, and is therefore a gratuitous, scurrilous, scandalous personal attack on me and my integrity. Therefore, I have to consider what sanctions to impose for that conduct. There are several possible consequences. I

could disqualify Mr. Zalkind from further participation in this case since he is not a member of this bar, and in my view he has violated ethical requirements and obligations by the filing of this affidavit. Mr. Zalkind has indicated to me that he is not willing to act as an officer of this Court, but is rather an antagonist to the Court. This is sometimes referred to as the confrontational approach to advocacy.

"In addition, Mr. Zalkind has indicated to me that the oath does not mean much to him, and that he will say just about anything when it suits his purposes. Therefore, Mr. Zalkind has no credibility with this Court....

"Thirdly, there is the matter of contempt. This affidavit, it seems to me, is contemptuous and is a personal attack on the Court, without factual basis whatsoever. And I suppose one consideration is whether or not perjury was committed. I will leave to the U.S. Attorney consideration of whether Mr. Zalkind by this affidavit, and Mr. Good by his testimony, should be considered candidates before a grand jury for perjury."

The court then continued until May 19, 1987 consideration of both other pending motions and "any arguments anyone wishes to make on the appropriate sanctions of Mr. Zalkind."

By order dated May 13, 1987, this court denied defendants' motion to stay the May 19 hearing and further proceedings.

On May 19, 1987 Judge Lagueux issed a memorandum and show cause order. The memorandum reiterated the court's perception that Zalkind's § 144 affidavit constituted a "scurrilous, personal attack upon the integrity of [the] Court" and concluded that by submitting such an affidavit, Zalkind had *prima facie* violated the following provisions of the Code of Professional Responsibility of the Supreme Court of Rhode Island: DR 1–102(A)(4), (5), and (6) (proscribing conduct which is dishonest, fraudulent, deceitful or prejudicial to the administration of justice); DR 7–102 (lawyer shall not knowingly make a false statement of law or fact); and DR 8–102 (lawyer shall

not knowingly make false accusation against a judge). The most appropriate sanction, for such violations, Judge Lagueux stated, was revocation of Zalkind's conditional privilege to appear *pro hac vice.* A hearing was then scheduled for September 22, 1987 at which Zalkind was ordered to show cause why he should not be adjudged in violation of the enumerated disciplinary rules and his *pro hac vice* status revoked.

In order not to prejudice Lynn (Zalkind represents Cooper, not Lynn) until such time as Judge Lagueux rendered a final determination on the ethical violations, Judge Lagueux proposed to sever Lynn's trial from Cooper's and to try Lynn in June. The government had no objection. Counsel for Lynn objected strenuously. Counsel had only recently been obtained (after Good's withdrawal), had not digested all the necessary trial preparation materials, and had been relying on Zalkind, who had been involved in the case for eight months, to be, in effect, lead counsel in view of his extensive familiarity not only with Cooper and Lynn's alleged involvement, but also with materials involving other alleged conspirators in this large scale, multi-national drug conspiracy. Judge Lagueux severed the trials and scheduled Lynn's trial for August 11, 1987. Petitioners see this severance and refusal to postpone Lynn's trial until after Zalkind's status is resolved so that the two might be tried together as wasteful of resources and further evidence of bias.

Judge Lagueux's language in his opinion denying the motion for disqualification and threatening sanctions is strong and presents a closer question. Zalkind, Cooper's defense counsel, has been told he has no credibility, and, in the judge's eyes, may be a fit candidate for a perjury indictment. Furthermore, he faces the threat of removal as trial counsel simply, in his view, for having discharged—after consultation with other lawyers and extensive research, according to affidavits by Homan and Lynn's new counsel, Wall—his responsibility of vigorously representing his clients. But, then, the Dershowitz affair was irrelevant to the instant proceedings, and Zalkind's

charge and overgeneralization from Judge Lagueux's criticism of Professor Dershowitz that Judge Lagueux is prejudiced both against Massachusetts attorneys and in favor of Rhode Island ones could, not unreasonably, be viewed as a calculated insult.

A judge who believes misconduct has occurred has a responsibility to act. If a counsel oversteps his bounds, delay in issuing warnings or taking action may lead to matters getting further out of hand and render it more difficult for the judge to maintain order during trial. While we believe that Judge Lagueux's reaction to Zalkind's affidavit in support of the motion to disqualify was highly charged and that due deliberation should be given before taking the extraordinary step of depriving Cooper of his counsel of choice, we do not now purport to pass on whether disciplinary action of any kind is warranted against Zalkind. Even a judge's mistaken judgment that an attorney is in need of sanction, like a judge's mistaken ruling on, say, a pretrial motion, would not establish prejudice or the appearance thereof. *See In re Union Leader Corporation,* 292 F.2d 381, 390–391 (1st Cir.1961), *cert. denied,* 368 U.S. 927, 82 S.Ct. 361, 7 L.Ed.2d 190 (1961) (whether or not trial court was correct in its conclusion that a party had engaged in misconduct, the court's view was not unwarranted and did not indicate personal bias or prejudice); *Rosen v. Sugarman,* 357 F.2d 794, 799–800 (2d Cir.1966) (Second Circuit found that $50 contempt fine and threat of confinement imposed on counsel—but later retracted—were unwarranted and that judge's apparent attempt to discredit lawyer's testimony was "careless of [the] manifestation of constant impartiality which a judge should at all times preserve," but did not require disqualification).

█ We do not find the cases on which petitioners particularly rely controlling. *Gardiner v. A.H. Robins Co., Inc.,* 747 F.2d 1180 (8th Cir.1984), involved a judicial pronouncement that the plaintiffs were "right" when no trial or evidentiary hearing had ever been held. In the present case, Judge Lagueux has not prejudged

Cooper's and Lynn's guilt or innocence. After a full evidentiary hearing, he did find a potential defense wanting, but has not precluded defendants from raising it at trial. Judges, in the course of ruling on pretrial motions, often make similar decisions which implicitly reflect on the strength of a defense. That does not constitute prejudgment of a case. Nor is *Nicodemus v. Chrysler Corp.*, 596 F.2d 152 (6th Cir.1979), compelling. There, the trial judge in the course of ruling on a motion for preliminary injunction referred to a corporate *party* as a "bunch of villains," "interested in feathering their own nests at the expense of everybody," and unworthy of belief. While it is true that in the present case Judge Lagueux has said that Zalkind has no credibility, Zalkind is not a *party* and presumably a jury—not Judge Lagueux—will, at trial, be making any credibility determinations concerning parties. Of course, an attorney's credibility with the court is not irrelevant to the course of a trial, during which counsel may be required to make, say, proffers concerning what the evidence is likely to be and such proffers may affect the timing or admissibility of evidence. An adequate record, however, will preserve such matters for review on appeal.

Judges are not disqualified from trying defendants of whom, through prior judicial proceedings, they have acquired a low view. *See e.g., United States v. Phillips*, 664 F.2d 971, 1003–1004 and n. 42 (5th Cir.1981), *cert. denied sub. nom. Meinster v. United States*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982) (judge's statements, made after hearing of defendants' plans to kill him, that defendants had done everything in their power to disrupt the proceedings and had exhibited nothing but contempt for the judicial process, did not exhibit pervasive bias warranting disqualification); *In re M. Ibrahim Khan, P.S.C.*, 751 F.2d 162, 165 (6th Cir.1984) (that in the course of dismissing party's chapter 11 proceeding judge stated that party had "conscripted" and "vulgarized" the legal system and that case revealed "bad faith in its ugliest form, the willful and malicious eva-

sion of a high legal duty by turning the legal system against is own ends, executed with naked arrogance" did not disqualify judge from sitting on party's subsequent chapter 7 proceeding). This is because judges are expected to be able to keep their likes and dislikes from intruding upon their duty to ensure a fair trial. That Judge Lagueux's criticism in this case was directed at counsel, rather than a party, does not require a different result. We would expect that both counsel and court would strive to behave professionally at trial.

*The petition for writ of mandamus is denied.*