**LPP MORTGAGE LTD. f/k/a**
**LOAN PARTICIPANT PARTNERS, LTD., Plaintiff**
**v.**
**HENRY P. QUETEL a/k/a HENRY QUETEL and**
**CAROL A. QUETEL, Defendants**

Civil No. 4/2003

Territorial Court of the Virgin Islands

Division of St. Thomas and St. John

July 16, 2004

MICOL L. MORGAN, ESQUIRE, A.J. STONE, ESQUIRE, Dudley, Topper & Feuerzeig, St. Thomas, Virgin Islands, *Attorneys for Plaintiff.*

ROBERT KUNKEL, ESQUIRE, Legal Services of the Virgin Islands, St. Thomas, Virgin Islands, *Attorney for Defendants.*

KENDALL, *Judge*

## MEMORANDUM AND OPINION

(July 16, 2004)

THIS MATTER is before the Court on Plaintiff's Motion for Disqualification pursuant to Title 4 V.I.C. § 284(4). Defendants have not filed an Opposition thereto within the time required despite having advised the Court that they would do so. Upon consideration of the Motion and the record herein and for the reasons set forth below, the Motion will be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

In an attempt to expedite the disposition of this and other long pending civil cases when it recently assumed the Bench, this Court scheduled various Settlement Conferences. This case is one of those civil cases for which a Settlement Conference was held on June 7, 2004.

Plaintiff brought suit to foreclose on the home of Defendants, senior citizens and life-long residents of the Territory. They had paid for their home in full prior to it being severely damaged by hurricane Marilyn in 1995. The loan which is the subject of the action was obtained from the U.S. Small Business Administration (SBA) to repair the damages to the home caused by the hurricane. Defendants' only source of income is monthly Social Security payments and at approximately seventy (70)

years of age, they are hoping to live out their remaining years in their home.[1]

Plaintiff's Complaint alleges, *inter alia,* that on or about January 13, 1996, Defendant executed a promissory Note in favor of the SBA in the principal amount of $69,600.00 requiring the repayment of principal and interest at the rate of 4% per annum in consecutive monthly installments of $339.00.[2] As security for the Note, Defendants executed a mortgage on their residence located at Parcel No. 148-157 Estate Anna's Retreat No. 1, New Quarter, St. Thomas, V.I., in the amount of the note. The Note and Mortgage were assigned to Plaintiff on May 8, 2001.

The Complaint further alleges that on or about December 21, 2001, Plaintiff demanded payment from Defendants of outstanding principal, interest and late charges, due to their default. According to Plaintiff, the delinquent principal was $1,500.00.[3]

As a result of Defendants' alleged default, Plaintiff sought, *inter alia,* "judgment foreclosing the mortgage and ordering that the property be sold ..." *Id.* at paragraph (d).

Defendants did not file a formal Answer to the Complaint. However, in response thereto, they filed a *Motion to Appoint Mediator and Place Uncontested [sic] in Court Treasury.* Defendants "acklowledge[d] that they owe certain monies and they wish to deposit same with a depository designated by the Court where this matter is pending." Defendants' *Motion* at 1. Defendants further stated that they are "elderly residents of

---

[1]     During the Settlement Conference, the Court observed them to be in the twilight of their years on earth.

[2]     In a letter from Defendants' Counsel to Mr. Joel Ruiz, Plaintiff's Default Loan Specialist, dated June 9, 2003, Defendants allege that the "The payments they were [obligated to] make were $250.00 each month". *See,* Exhibit No. 1 of *Plaintiff's Opposition to Defendants' Motion to Enlarge Time for Filing Memorandum in Support of Answer to Plaintiff's Motion Summary Judgment.*

[3]     Per letter to Defendants dated December 21, 2001, Counsel for Plaintiff, Attorney Micol Morgan, informed Defendants of their default and advised them that in order "to cure your default, you must pay to LLP [within 30 days of the date of this letter] the sum of $1,500.00 representing the delinquent principal, interest and late charges as of November 26, 2001". *See,* Exhibit 1 of Affidavit of Henry P. Quetel in support of *Defendants' Answer to Motion for Summary Judgment, etc.* By express mail dated January 11, 2002, Defendants forwarded three (3) U.S. Postal Money Orders in the amount of $500.00 each to Plaintiff as directed, thereby curing the default. In light of this payment, the allegation of default in paragraph 11 of the Complaint is false with respect to Defendants' default as of November 26, 2001, since that default was cured.

the U.S. Virgin Islands who have lived in the same premises for many years ..." *Id.*

In its Opposition to Defendants' *Motion to Appoint Mediator etc.,* Plaintiff contended, *inter alia,* that "while Defendants highlight their age, length of residency ... not one of these factors is a defense to the debt and foreclosure action, nor are they of any consequences to the propriety of mediation in this case." Plaintiff further contended that "submission to mediation in the context of a debt and foreclosure action is counterproductive." *See,* Plaintiff's *Opposition to Motion to Appoint Mediator and Place Uncontested [sic] in Court Treasury.*

By Orders dated March 17, 2003, Judge Brenda Hollar, who originally was assigned to the case, referred the matter to mediation and, upon "finding that Defendants represent to the Court that their monthly payment had been $250.00 and that they were approximately one years [sic] in arrears as of December 31, 2002," Ordered Defendants to "place the sum of three thousand dollars ($3,000.00) with the Clerk of the Court until further order of this Court." Pursuant to the Court's Order, Defendants deposited that amount into the Court's registry on March 27, 2003.

On March 24, 2003, Plaintiff filed its *Motion to Dispense with Mediation* contending that "the only issue before this Court is one of law." Plaintiff also moved for Summary Judgment on March 24, 2003 and on May 7, 2003, Judge Hollar entered an Order staying mediation to allow Defendants time to file their Opposition to the *Motion for Summary Judgment.*

A Status Conference was conducted by Judge Hollar on August 7, 2003. Plaintiff asserted that in order to bring the loan current, Defendants would have to pay Sixteen Thousand Three Hundred Dollars ($16,300.00). Judge Hollar Ordered the parties to complete mediation by September 30, 2003[4] and denied the *Motion for Summary Judgment* because, *inter alia,* current figures were not provided with the Motion.

On October 3, 2003, the undersigned was sworn in as a Judge of the Territorial Court and this case was thereafter assigned to him because Judge Hollar had been assigned to the Family Division. A Status Conference was held on March 19, 2004 at which time Plaintiff renewed

---

[4]   There is nothing in the record indicating that the parties complied with the Court's Order to mediate.

its *Motion for Summary Judgment*. The matter was continued to May 13, 2004 for Settlement Conference, but neither Plaintiff nor its Counsel appeared at that time. By Order dated May 17, 2004, the Settlement Conference was continued to June 7, 2004.

At the outset of the Settlement Conference, Counsel for Plaintiff "objected to [the undersigned] presiding over settlement negotiations" arguing that it would be inappropriate for the Court to be a "mediator" in the matter.[5] Plaintiff's *Memorandum of Law in Support of Motion for Disqualification* at 2. Due to Plaintiff's refusal to engage in good-faith settlement discussions, the Settlement Conference was unsuccessful. Shortly thereafter, Plaintiff filed the instant Motion for the Court's disqualification pursuant to Title 4 V.I.C. § 284(4).

## DISCUSSION

### I. Standard for Disqualification

■ Title 4 V.I.C. § 284(4) states that "no judge shall sit or act as such in any action or proceeding ... when it is made to appear probable that, by reason of bias or prejudice of such judge, a fair and impartial trial cannot be had before him." Under this statute, the movant must allege facts "reflect[ing] a clear probability that the judge is biased against the party." *See, Government of the Virgin Islands v. Gereau*, 11 V.I. 265, 296, 502

---

[5]    The Court conducted a Settlement Conference and not a Mediation. Settlement Conferences are authorized by Rule 16 of the Federal Rules of Civil Procedures which provides in pertinent part:

(a)   Pretrial Conferences: Objectives. In any action, the Court may in its discretion direct the Attorneys for the parties ... to appear before it for a conference or conferences before trial for such purposes as ... (5) facilitating the settlement of the case. (emphasis added).

Contrary to Plaintiff's assertion, a Settlement Conference is not a Mediation. Mediation of civil matters in the Territorial Court is governed by Rule 40 of the Rules of the Court and requires specific procedures for its conduct. Counsel for the Plaintiff should be aware of this Rule, having twice previously objected to the Court's Order to mediate the matter pursuant to Rule 40. The Court's Order dated May 17, 2004 did not advise the parties to appear before it for Mediation pursuant to Rule 40. Rather, it clearly Ordered the parties to appear for a Settlement Conference on Monday, June 7, 2004 at 9:00 a.m. Indeed, Rule 40, by definition, prohibits Judges from mediating actions. Accordingly, there is no merit to Plaintiff's objection to the undersigned "presiding over settlement negotiations [because he] ... would not be an appropriate mediator in this matter". *Plaintiff's Memo.* at 2. The Court therefore had every right to "overruled Attorney Stone's objection" as a matter of law.

F.2d 914, 931 (3d Cir. 1974). In *Liteky v. United States*, 510 U.S. 540, 551, 114 S. Ct. 1147, 1155, 127 L. Ed. 2d 474 (1994), the Supreme Court had occasion to construe Title 28 U.S.C. § 455(a) which, like Title 4 V.I.C. § 284(4), requires a Judge to disqualify him/herself in any proceeding in which his/her impartiality might reasonably be questioned due to, *inter alia,* personal bias or prejudice concerning a party. The Court, quoting Judge Jerome Frank in *In Re J.P. Linahan Inc.*, 138 F.2d 650, 654 (CA2 1943) noted that: "Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the Judge did not form judgments of the actors in those Court-house dramas called trials, he could never render decisions". *Id.* Continuing, the Court noted that "Opinions formed by the Judge on the basis of facts introduced or events occurring in the course of current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* at 555.

## II. Motion for Disqualification

### A. Judicially Noticing a Fact during a Settlement Conference does not Constitute the Introduction of Unasserted Defenses in an Action.

The main contentions in Plaintiff's Motion are that the Court asserted an "unasserted defense" and advocated on behalf of Defendants, thus evidencing a clear probability of bias.

The contention that the Court introduced unasserted defenses into the action is frivolous. But even assuming, *aguendo,* the correctness of Plaintiff's assertion, it does not, as Plaintiff contends, reflect a clear probability that the Court is biased or prejudiced against Plaintiff. Disqualification requires proof of personal bias, not adverse attitudes based on the study of facts. *See, Joseph v. Zinke-Smith*, 6 V.I. 219, 223 (Mun. Ct. 1967). *See also, U.S. v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S. Ct. 1698, 1710, 16 L. Ed. 2d 778 (1966).

Here, Plaintiff's Counsel take exception to the Court's reference to the Note executed by the Defendants as being a contract of adhesion. However, that reference came in response to the Plaintiff's strenuous insistence that Defendants were in violation of the terms of the Note, thus foreclosing any settlement discussion. There could be no question

that the Note at issue here is essentially an adhesion contract between Plaintiff and the Defendants. An "Adhesion Contract" is defined as:

> [A] standardized contract form offered to consumers of goods and services on essentially "take it or leave it" basis without affording consumer realistic opportunity to bargain and under such conditions that consumer cannot obtain desired product or services except by acquiescing in form contract. Distinctive feature of adhesion contract is that weaker party has no realistic choice as to its terms.

*See*, BLACK'S LAW DICTIONARY, 38 (5th Ed. 1979)

When viewed in light of the foregoing definition, it is indisputable that the Note is a "standardized contract form" designated as "SBA Form 147 B (5-77) Ref: SOP 50 35 Previous Editions Are Obsolete."[6] It is also indisputable that, except for the amount and duration, the Defendants did not realistically bargain or negotiate **any** of the terms and conditions of the Note, including the acceleration clause which is central to this action. In all probability, the Note was presented to Defendants on a "take or leave it" basis. Moreover, Defendants were undoubtedly the "weaker party", "ha[d] no realistic choice as to [the Note's] terms" and could not obtain the loan except by acquiescing to the terms of the Note.

The Note executed by Defendants is typical of Notes executed by consumers in similar situations throughout the Territory and the United States. Based upon the definition of an "adhesion contract" set forth above, one does not have to be a rocket scientist to conclude that the Note executed by Defendants is in fact an adhesion contract. By referring to it as such, the Court was merely, *sua sponte,* taking judicial notice of the fact that the Note was indeed an adhesion contract as a matter of law.[7] Such notice was taken to encourage an inflexible party to engage in a Settlement Conference in good faith.

For Plaintiff to suggest that by so doing, the Court was "advanc[ing] an argument that has never been proffered" is disingenuous at best. Specifically, it is axiomatic that the taking of judicial notice of a fact "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned" does not make the

---

[6]  *See*, Exhibit No. 1 of Plaintiff's *"Memorandum in Support of Motion for Summary Judgment"*.

[7]  Rule 201(c) of the F.R.E.

Court an advocate of such a fact as contended by Plaintiff.[8] Accordingly, Plaintiff's contention that by so doing, the Court "abandoned his role as a neutral arbiter in favor of generating theories for the defense" or introduced "unasserted defenses" is absurd and must be rejected.

## B. The Court's Efforts to Secure a Settlement by the Parties do not Establish a Clear Probability of Bias so that a Fair Trial Cannot be Obtained

### 1. The Court did not Advocate on Behalf of any Party

As noted heretofore, taking judicial notice that the Note was an adhesion contract did not make the Court an advocate of that fact or result in the introduction of any "unasserted defenses". Moreover, in attempting to settle the case, the Court acts as a facilitator in the Settlement Conference. Specifically, it has been stated that:

> To achieve settlement, a judge should not be afraid to adopt an active role. He or she may need to shift from the position of a neutral facilitator who serves as a catalyst to help the two sides communicate to the position of an active participant who suggests possible settlement terms and voices an opinion about the feasibility of settlement ... Usually, however, if the parties truly desire to settle, they will appreciate this proactive stance ...

*See,* Morton Denlow, *Breaking Impasses in Settlement Conferences: Five Techniques for Resolution,* THE JUDGES' JOURNAL, Fall 2000.

Given Plaintiff Counsel's clear intention from the outset of the litigation to avoid any amicable resolution of the matter by first opposing mediation then moving to dispense with it and refusing to make any *bona-fide* attempt at settlement,[9] they could not appreciate the Court's

---

[8]   Rule 201(b) of the F.R.E.

[9]   Plaintiff's lack of good faith is compounded when viewed in light of Defendants' good faith. Specifically, not only did Defendants cure their default as of November 21, 2001 but after "finding that Defendants were in arrears in the amount of $3,000.00 as of December 31, 2002", Judge Hollar Ordered them to put that amount in the Court's registry pending further Order. As noted heretofore, Defendants deposited $3,000.00 in the registry on March 27, 2003. Additionally, during the Settlement Conference, Defendants offered to pay the outstanding principal of $4,064.19 demanded by Plaintiff, plus an additional $5,000.00 to settle the matter.

attempt to be proactive in the Settlement Conference based upon the foregoing approach and given the relatively simple issues involved.

It was clear to the Court that given the facts of the case, the rigid position of Plaintiff displayed a misunderstanding of the apposite rules and law. Furthermore, during the Conference, Plaintiff's rigidity was also reflected in its demand for Twenty-Three Thousand Seven Hundred Nine Dollars and Thirty-Five Cents ($23,709.35) to settle the matter. This amount comprised the following:

| | |
|---|---|
| Outstanding Principal: | $4,064.19 |
| Interest at 4%: | 4,785.64 |
| Attorney's Fees: | 4,734.00 |
| Costs: | 39.89 |
| Fees, Late Charges: | 4,768.52 |
| Escrow Deficit: | 5,317.11 |
| | $23,709.35 |

The Court took judicial notice of the fact that with the possible exception of the outstanding principal balance, Attorney's fees and the escrow deficit, charges for interest, costs, fees and late charges are waivable or negotiable by lending institutions, including Plaintiff. Thus, the Court urged Plaintiff's Attorneys to consider such a waiver or negotiation in the interest of justice.[10] However, they rejected that proposal by the Court and refused to waive or negotiate a reduction of these fees.

Given the scenario of Defendants' outright ownership of their home prior to hurricane Marilyn, their ages, and their desire to live out their remaining years in their home, the Court then continued to urge the Defendants to increase their lump sum and monthly payments to Plaintiff including Attorneys fees and escrow deficit to bring the loan current. The Defendants indicated that they were willing to bring the loan current by paying the outstanding balance of approximately Four Thousand Dollars ($4,000.00) plus an additional Five Thousand Dollars ($5,000.00) toward late fees etc, and continue to make their regular monthly payment of Two Hundred and Fifty Dollars ($250.00). Plaintiff's response was that its final offer was its demand for payment of approximately Twenty-Two

---

[10]    In light of Defendants' show of good faith, their age and income, such waiver or negotiation was not unreasonable, assuming Plaintiff was truly interested in a just settlement.

Thousand Dollars ($22,000.00) to settle the matter and/or a modification or restructuring of the loan.

Not only did the Defendants state that they lacked the funds to pay Plaintiff Twenty-Two Thousand Dollars ($22,000.00) but any modification/restructuring of the loan would, in all probability, result in Defendants, without any potential earning power, being burdened with a bigger loan, more difficulty in repaying it, and eviction from their home.

Upon hearing Plaintiff's response, the Court attempted to get Plaintiff to reconsider its rigid position, after getting the Defendants to maximize their offer. Given the fact that part of Plaintiff's operating expenses includes a certain set aside for bad/delinquent loans and that it could utilize a small portion of this set aside to offset Defendants' fees and late charges, the Court reasoned that Plaintiff's reconsideration would not do violence to its operations or profit margin in light of the relatively paltry amount involved. Moreover, Plaintiff could also consider reducing the Attorney's fees, given the minimal level of effort and the routine and ordinary nature of Counsel's representation in the matter, in which the use of two Attorneys was unnecessary. However, since the parties could not come to an agreement, the Settlement Conference was unsuccessful.

██ Such a reasonable and balanced approach by the Court to get both sides to settle this case cannot be considered "advocating" for any party, and does not constitute "bias" that prevents a fair trial where the Court's efforts do not result in settlement.

### 2. The Conduct of Plaintiff's Counsel Showed their Misunderstanding of the Mediation and Settlement Conference Rules, and the Court's Search for Justice

██ In conducting the Settlement Conference, the Court had an interest in promoting better behavior on the part of Attorneys and their appropriate understanding of the rules. As the U.S. District Court for the Northern District of Texas, sitting *en banc,* stated:

> We address today a problem that, though of relatively recent origin, is so pernicious that it threatens to delay the administration of justice and to place litigation beyond the financial reach of litigants. With alarming frequency, we find that valuable judicial and attorney time is consumed in resolving unnecessary contention and sharp practices between lawyers ... As judges and former

practitioners from varied backgrounds and levels of experience, we ... observe patterns of behavior that forebode ill for our system of justice.

*Dondi Properties Corp. v. Commerce Savings & Loan Association*, 121 F.R.D. 284, 286 (N.D. Tex. 1988). The Court went on to observe:

Those litigators who persist in viewing themselves solely as combatants, or who perceive that they are retained to win at all costs without regard to fundamental principles of justice, will find that their conduct does not square with the practices we expect of them.

*Id.* at 288. At the Settlement Conference, the Court expected both sides to attempt to settle the matter in good faith instead of trying to "win at all costs." By failing to understand the distinction between the Mediation rules and the Settlement Conference rules, the conduct of Plaintiff's Counsel constituted "unnecessary contention". The Court's obligation was to attempt to obtain a fair and amicable settlement despite such "unnecessary contention".

Unfortunately, such misunderstanding of the rules appears to have obstructed the search for justice by both of Plaintiff's young Attorneys. This Court urges them to seek a sense of intrinsic motivation by "helping others" and "making a difference" instead of only focusing on extrinsic motivation by "winning cases" and "impressing others".

Perhaps their intransigence could be avoided in future by reading and understanding the article in the June, 2004 edition of the ABA JOURNAL, entitled "Temptation To Tally" by Steven Keeva. *See,* footnote 9, *infra.* There, the difference between intrinsic and extrinsic motivation is explained. It is the hope of this Court that these talented, young Attorneys will become more aware of their role in the justice system when another opportunity arises to "make a difference" in the lives of elderly parties under such extraordinary and tragic circumstances, instead of merely "seeking to win" a case. Perhaps with more experience they will learn that a good-faith and amicable settlement by the parties is, in fact, a victory for justice.

### 3. Plaintiff's Characterization of the Court's Behavior as "Inappropriate" and "Non-Judicial" is Erroneous

Plaintiff alleges that the Court "attempt[ed] to browbeat a party into accepting settlement terms that clearly favor the opposing party" and that "such behavior falls well outside the definition of conduct appropriate for judges who are the final arbiters of fact and law." *Plaintiff's Memorandum* at 7-8. Since the Court attempted to encourage both parties to reconsider their settlement offers, it categorically rejects this allegation as factually erroneous and offensive, as well as Plaintiff's allegation that the Court possesses "clear antipathy toward mortgage lenders in particular and the banking industry in general." *Id.* During its brief tenure on the Bench, this Court has heard many cases involving commercial banks and in most instances has ruled in their favor. For Counsel to baldly accuse the Court of "browbeat[ing]" them and hav[ing] "animosity" towards banks is therefore unprincipled and unfounded. This is a dispute which the Court believes could have been resolved amicably between the parties. Unfortunately, it deteriorated into non-resolution due in no small measure to the attitude of Counsel for Plaintiff.[11]

Furthermore, Plaintiff's inference that the Court harbors or appears to possess some personal antagonism toward Plaintiff has absolutely no basis in fact.[12] None of the Court's statements approach the sort of conduct required for disqualification. The Court's "admonishment" or

---

[11]    As noted heretofore, from the inception of this litigation, when Judge Hollar referred the matter to mediation, the attitude of Plaintiff's Counsel, both young Lawyers, was dismissive of the Court's effort at amicable resolution short of trial. This attitude was later compounded by Counsel's inability to distinguish between "Mediation" and "Settlement Conferences" and is consistent with "recent research [which] shows that students who come to law school with a strong sense of intrinsic motivation—helping others or making a difference—very often experience a dramatic shift toward extrinsic motivations during the law school. Their focus then tends to be on such factors as making a lot of money and impressing other people ...". *See*, Steven Keeva, "Temptation to Tally—Change Your Definition of Wins and Losses to Find New Meaning in Your Practice", ABA JOURNAL, June 2004 pages 74-75. *See*, Section 2, *supra*.

[12]    As noted heretofore, while Defendants appeared, neither Plaintiff nor its Counsel appeared for the Settlement Conference on May 13, 2004. No Motion for Continuance or Notice to the Court of its failure to appear was filed by Plaintiff. Such absence, especially when viewed in light of Plaintiff's attitude toward the Court when Judge Hollar attempted to settle the matter, could have been deemed to be contemptible. The Court, however, did not sanction Plaintiff or its Counsel for their conduct. Such restraint is inconsistent with any personal animus toward Plaintiff or its Counsel.

"chastisement" of Plaintiff's Counsel in the Settlement Conference for failing to move from their rigid position or consider a reasonable settlement cannot reasonably be deemed as antagonism toward Plaintiff and provides absolutely no grounds for judicial disqualification. As the Supreme Court noted in *Liteky, supra:*

> ■ Judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge ... Not establishing bias or partiality ... are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.[13]

*Liteky, supra* at 555, 556, 114 S. Ct. at 1157.

Here, Plaintiff Counsel's refusal to engage in the Settlement Conference in good faith did cause dissatisfaction, but this only resulted in an unsuccessful Settlement Conference. No settlement was coerced by the Court, and any remarks made, according to *Liteky, supra,* remain immune.

Moreover, the vituperative and *ad hominem* attacks leveled by Plaintiff's Counsel at the Court are not only unwarranted, but borders on unprofessionalism and contumacy. Rule 8.2(a) of the Model Rules of Professional Conduct provides that "[a] lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge ..." emphasis added. Clearly Counsel's statements regarding the Court's antipathy towards the banking industry, their charges of unasserted defenses introduced by the Court, and the Court's advocacy on behalf of Defendants, are false statements made with reckless disregard for their truth or falsity. Furthermore, "[t]he use of *ad hominem* attacks toward the trial judge when an adverse decision is rendered, is ... ill-advised at best, and certainly is a violation of an attorney's duty, as guardian of the law,

---

[13] *See, also, In re Cooper,* 821 F.2d 833, 838 (1st Cir. 1987) ("Generally, clashes between court and counsel are an insufficient basis for disqualification ...").

to maintain the highest standards of ethical conduct and to demonstrate respect for the legal system and those who serve it, including judges." *Johnson v. Johnson*, 948 S.W.2d 835, 840 (Tex. App. 1997). While the Court did not render a decision in the matter, Plaintiff Counsel's attack on the Court clearly demonstrates their lack of respect for the legal system and, *ergo,* the Court. As the Court in *Johnson v. Johnson* noted, "when attorneys speak disrespectfully of the trial court, they 'exceed their rights and evidence a want of proper respect for the court ...'" *Id.* (citing *Mossop v. Zapp*, 179 S.W. 685 (Tex. App. 1915)). Plaintiff Counsel's resort to personal attacks on the Court in the interest of serving their client serves neither the client nor the legal profession. *Id.* Zealous representation does not and cannot include degrading the Court in the hopes of gaining a perceived advantage. The Court considers their misconduct to be a veiled attempt to engage in Judge-shopping, hoping that holding them in contempt would cause the Judge to disqualify himself.

The attitude displayed by Plaintiff's Counsel during the Settlement Conference and in their Motion for Disqualification is typical of the arrogance of some young lawyers who disregard justice in search of maximizing their monetary verdict. The Court excuses them for their youth and inexperience but places them on notice of their obligation as lawyers to do justice and respect those who seek justice beyond the narrow confines of an adhesion contract.

█ Based upon the foregoing no credence can be accorded Plaintiff's characterization of the Court's effort to settle the matter as "inappropriate" and "non-judicial" and as such it must be rejected.

## CONCLUSION

As the repository of justice, the Court's function in any litigation is to ensure that the parties, regardless of their economic power, receive justice.

Furthermore, the Court's role in litigation is not to sit idly by, hesitant to comment on Counsel's missteps. Courts often must be more active in restraining Counsel than client, and a party need not typically fear that disquiet between Judge and attorney will color the Court's perception of the party. *Spangler v. Sears, Roebuck & Co.*, 759 F. Supp. 1327, 1335 (S.D. Ind. 1991). Therefore, any criticism of Plaintiff's Counsel is not an indication of bias toward Plaintiff or its Counsel and this Court is

immune from disqualification for such criticism. Nor does it demonstrate such "a deep-seated favoritism or antagonism by the Court that would make fair judgment impossible". *Liteky, supra* at 555, 114 S. Ct. at 1157. Accordingly, the Court categorically rejects Plaintiff's attempt to procure its disqualification based solely upon its improper characterization of the Court's conduct.

Based on the foregoing, Plaintiff has failed to meet the requirements for disqualification set forth in Title 4 V.I.C. § 284(4). Accordingly, Plaintiff's "Motion for Disqualification" is DENIED.