# United States Court of Appeals
## For the First Circuit

Nos. 14-2020
    14-2040

UNITED STATES OF AMERICA,

Appellee,

v.

JOEL DUDLEY,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Lynch, Thompson, and Kayatta,
Circuit Judges.

Lauren Wille, with whom John Paul DeGrinney and DeGrinney Law Offices were on brief, for appellant.
Renée M. Bunker, Assistant United States Attorney, with whom Thomas E. Delahanty II, United States Attorney, was on brief, for appellee.

October 30, 2015

**THOMPSON**, **Circuit Judge**.  After two separate jury trials, Defendant-Appellant Joel Dudley (Dudley) was convicted of one count of possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2256(8)(A), and one count of false declaration before the court, in violation of 18 U.S.C. § 1623(a). On appeal, Dudley contests the denial of his motion to suppress in the possession matter and further argues that the district court erred by permitting the government to play two video excerpts of child pornography for the jury.  Dudley also contests the denial of his motion for judgment of acquittal in the perjury matter. For the reasons that follow, we affirm Dudley's convictions.

## OVERVIEW[1]

Around noon on August 20, 2012, state and federal officers executed a search warrant, obtained in the course of a child pornography investigation, at Dudley's Westbrook, Maine residence.  Officers had traced to Dudley's apartment an internet protocol (IP) address that had shared child pornography using a peer-to-peer file sharing software called Ares.  While the search of Dudley's apartment was underway, two Homeland Security Investigations (HSI) Special Agents, David Fife (Fife), the lead investigator and case agent in the matter, and Martin Conley (Conley), interviewed Dudley in Agent Fife's SUV for about forty

---

[1] We summarize the underlying facts and history of the case, saving additional details for our analysis of the alleged errors.

minutes. During this interview, Dudley admitted that he was familiar with the Ares network and made other incriminating statements concerning the downloading of child pornography. Ultimately, two CDs containing child pornography were found on a desk in Dudley's office. Dudley was subsequently arrested and indicted on one count of possession of child pornography.

Prior to trial on the possession matter, Dudley filed a motion to suppress statements made to Agents Fife and Conley, and testified at the suppression hearing. The district court denied the motion.[2] Later, based on statements he made while testifying at the suppression hearing, the government charged Dudley by indictment with one count of false declaration before the court.

After a two-day jury trial on the possession matter, Dudley was found guilty of possessing child pornography. A few months later, another jury found Dudley guilty, this time of providing materially false testimony during the suppression hearing.

---

[2] The suppression hearing was held before a magistrate judge. Following Dudley's objection to the magistrate judge's recommended decision and a response by the government, the district judge adopted the magistrate judge's proposed findings and decision, and denied the motion to suppress. For simplicity's sake, we will refer to the findings and conclusions of the magistrate judge as those of the district court.

Dudley now appeals his convictions.[3]  On appeal, Dudley raises three issues.[4]  With regard to the possession charge, Dudley argues that the district court (1) committed reversible error when it denied his motion to suppress, and (2) erred in allowing the government to play two thirty-second video excerpts of child pornography to the jury during its closing.  As for the perjury charge, Dudley contends that the district court erred when it denied Dudley's motion to acquit.

**THE POSSESSION MATTER**

## I.   Dudley's Motion to Suppress

Dudley sought to suppress all evidence obtained as a result of his allegedly illegal interrogation by Agents Fife and Conley, arguing that the agents continued to question him after he had invoked his right to counsel.  The thrust of Dudley's testimony was that he had requested an attorney on three separate occasions.[5]

---

[3] Dudley's appeals have been consolidated pursuant to Federal Rule of Appellate Procedure 3(b)(2).

[4] Dudley was sentenced to 96 months of imprisonment on the possession conviction and 60 months of imprisonment on the perjury conviction, to be served concurrently.  He does not challenge his sentence on appeal.

[5] Six other witnesses testified at the suppression hearing. Dudley offered three witnesses who had been present on the day of the search:  his wife, Lori Dudley; his mother, Cheryl Dearborn; and a close family friend and roommate of the Dudleys, Charal Boothby.  In addition, three law-enforcement officers -- Agents Fife and Conley, and their supervisor, Resident Agent in Charge (RAC) Gary Cote -- testified for the government.

First, Dudley testified that, as he was led out of his apartment, he told his wife "to call Gordon to get ahold of Joseph about the -- about getting a lawyer." Second, Dudley claimed that when Agent Fife asked if he was willing to talk to him, Dudley said that he "would be willing to listen to an explanation" but that he wanted a lawyer. According to Dudley, Agent Fife responded by telling him that he could have a lawyer if he wanted one, but he was not a suspect and it would look better if he agreed to speak with them. And finally, Dudley asserted that after being read his Miranda rights, see Miranda v. Arizona, 384 U.S. 436 (1966), he reiterated to Agents Fife and Conley his desire to have an attorney present for any questioning.

As may be expected, the government disputed Dudley's version of events, countering that Dudley was not in custody when he spoke to the Agents and that, even if Dudley had been in custody when he was interviewed, he knowingly and voluntarily waived his rights. Specifically, the government argued that Dudley's "claim that he invoked his right to counsel after being read his Miranda rights [was] simply false" and that Dudley "voluntarily elected to speak with investigators."

A. Findings and Conclusions of the District Court

On the whole, the district court did not find Dudley's testimony credible, and largely crediting the agents' version of events, the district court found the following relevant facts,

which are reasonably supported by the record.  See United States v. Hughes, 640 F.3d 428, 434 (1st Cir. 2011).

On the afternoon of August 20, 2012, twelve law-enforcement officers, including six uniformed police officers, detectives and task force officers, and six HSI agents in plain clothes, arrived at Dudley's apartment to execute the search warrant.  Prior to arriving at the apartment building, the officers[6] had been informed by the Westbrook Police Department that Dudley lived in the apartment with his wife, Lori Dudley (Lori), their three children, and a roommate, Charal Boothby (Boothby). Officers had also been cautioned that there were frequent transients in and out of the apartment and that Dudley was potentially in possession of a firearm.

While Agent Gary Cote (Cote) and another officer kept watch outside the multi-unit apartment building, the other officers entered the building and proceeded to Dudley's second-floor apartment with their guns drawn and in the "low ready" position.  When an officer knocked on the door and announced the presence of law enforcement, Lori answered but, when asked by the officer about Dudley's whereabouts, claimed that Dudley was not home.  With unfortunate timing perhaps, Dudley then stepped into view of the officers behind Lori.  Officer Fred Williams (Williams)

_____

[6] For clarity, we will refer to the officers and agents collectively as "officers."

of the Saco, Maine police department immediately removed Dudley from the apartment, brought him to a landing midway down the stairwell, and frisked him. Officer Williams then proceeded to remove Dudley's cell phone, handcuff him, and lead him down the stairs and outside to the front of the building.

As Dudley was being removed from the building, the remaining officers conducted a protective sweep of the apartment. In addition to Dudley and Lori, the officers came across five people in the apartment: the Dudleys' three children; the Dudleys' roommate, Boothby; and Boothby's younger brother, Robert Duquette.

When officers completed the protective sweep, the search began. At that point, Agent Fife left the apartment to find Dudley and located him downstairs with Agent Cote and a Westbrook police officer. When Agent Fife arrived, Dudley asked to smoke a cigarette, and Agent Fife removed Dudley's handcuffs so that he could do so. Agent Fife then explained that the officers were there because they had information that someone using an IP address at Dudley's apartment was sharing child pornography through the Ares peer-to-peer file sharing program.[7] Agent Fife further told Dudley that he was not under arrest but that he could not return to the apartment until the search was complete. Dudley asked to see the search warrant, which Fife provided.

_____

[7] Internet service providers assign individual computers specific IP addresses to access the internet.

Around this time, Agent Fife asked Dudley if he would be willing to speak with him, and Dudley said that he would. For privacy reasons, Agent Fife suggested that they talk inside his SUV, which he had parked in a driveway adjacent to Dudley's apartment. Dudley again agreed. Agent Fife sat in the driver's seat, while Dudley took the passenger seat, and Agent Conley, who by this point had joined Agent Fife, sat in the backseat behind Dudley. The doors to the SUV remained unlocked, and Dudley was reminded that he was free to leave. Agent Fife then apprised Dudley of his Miranda rights, reading from a standardized form. Dudley agreed to speak to the agents, remarking that he knew his rights and that he had been read the Miranda warnings on a previous occasion. Agent Fife did not have Dudley sign the standardized form because he did not believe that Dudley was in custody.

The interview, which was not recorded, lasted about forty minutes. According to Agent Fife, the conversation was very "cordial," and at no point did Dudley request that the interview stop. Near the end of the interview, Agent Cote signaled to Agent Fife that he needed to speak with him. There was a brief pause in the conversation as the agents spoke outside the vehicle, but Dudley remained in the car and the interview resumed shortly thereafter.

At the conclusion of the interview, Agent Fife told Dudley that he still could not return to the apartment because the

- 8 -

search was ongoing, but Dudley was allowed to sit alone and unhandcuffed on the front stoop near Agent Cote and other officers.

When officers found a CD containing child pornography in Dudley's office, Agent Fife approached Dudley on the stoop to ask if the items on his desk belonged to him. Dudley responded affirmatively to Agent Fife's questions.[8]

Three hours after it began the search concluded, resulting in Dudley being handcuffed and placed under arrest. As Dudley was transported to the county jail, he became agitated, repeatedly asked the officers what probable cause they had for the arrest, and threatened to sue.

In its decision, the district court assumed Dudley was in custody,[9] and also assumed that as he was escorted from the apartment he asked his wife to contact his attorney. Nevertheless, the district court concluded that there was no evidence that any law enforcement officer actually heard Dudley's statement to his wife and, therefore, the statement "was not in itself an unambiguous invocation of his right to counsel." The district court also determined that Dudley's assertion that he had twice invoked his right to counsel during his interview with Agents Fife

_____

[8] Although Dudley's response is not part of the district court's factual findings, Agent Fife testified that Dudley responded that the items in his office belonged to his business.

[9] The parties do not contest the district court's assumption that Dudley was in custody.

and Conley was not credible.  Instead, the district court credited the agents' testimony that Dudley never requested an attorney and never asked to stop the interview.

In particular, the district court noted that Dudley "admitted on cross-examination that (i) he knew his Miranda rights prior to his encounter that day with officers, (ii) he knew enough to ask to see the search warrant, (iii) upon his arrest later that day, he accused the officers of arresting him without probable cause and threatened to sue them, and (iv) he was 'quite protective' of his rights."  Therefore, the district court found that Dudley "likely would have invoked his right to counsel, and ceased answering officers' questions, if he did not wish the interview to continue."

Dudley now challenges this ruling, arguing, as he did below, that he unambiguously invoked his right to counsel as he was led from the apartment and again both before and during his interview with Agents Fife and Conley.  Consequently, Dudley argues the district court erred in denying his suppression motion.  We see no error.

B.  **Standard of Review**

When reviewing a denial of a motion to suppress, "[w]e view the facts in the light most favorable to the district court's ruling."  United States v. Camacho, 661 F.3d 718, 723 (1st Cir. 2011) (alteration in original) (quoting United States v. Soares,

521 F.3d 117, 118 (1st Cir. 2008)).  And "we review the district court's findings of fact and credibility determinations for clear error."  Id.  Under clear error review, we will reverse "only if, after considering all the evidence, we are left with a definite and firm conviction that a mistake has been made."  Id. (quoting United States v. McCarthy, 77 F.3d 522, 529 (1st Cir. 1996)).  On the other hand, we review the district court's legal determinations, including its application of the law to the facts, de novo.  Id. at 724.

## C.  Discussion

Once a suspect has invoked the right to counsel during a custodial interrogation, all questioning must stop until counsel can be provided.  Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). But this request for counsel must be clear and unambiguous.  Davis v. United States, 512 U.S. 452, 459 (1994) (statement, "Maybe I should talk to a lawyer," was not an unambiguous request for counsel, id. at 462).  "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel," officers need not stop questioning.  Id.

### 1.  Dudley's Request to "call Gordon"

Here, Dudley first argues that his statement to his wife as he was taken from the apartment (something along the lines of

- 11 -

"call Gordon to get ahold of Joseph about the -- about getting a lawyer" or "call Higgins") was a clear and unambiguous invocation of his right to counsel.  We do not agree.

Dudley testified that on the day of the search he was coming out of the bathroom when he heard "a commotion."  According to Dudley, when he walked into the living room, a police officer immediately grabbed his shoulder and led him from the apartment.  As he was being taken outside, and while "everybody was rushing into the house," he "made mention" to his wife, who was standing at the door, that she should "call Gordon to get ahold of Joseph about the -- about getting a lawyer."  Lori similarly testified that shortly after the police entered her home, Dudley told her "to call Higgins, his lawyer."  Dudley contends that if Lori "heard his request, there can be no doubt that the officers seizing [] Dudley also heard the request."  But neither Dudley nor Lori claimed that Dudley yelled or shouted his request -- testifying instead that Dudley "said" or "mentioned" to Lori that she should call his attorney.

Lori further said that when, in response to her husband's request, she reached for the telephone to call Dudley's attorney, an officer told her that she could not use the telephone.[10]  The

_____

[10] She acknowledged on cross examination, however, that she was never handcuffed or told that she could not leave the apartment, and that if she had wanted to call someone she could have left the apartment and used someone else's phone.

implication being, Dudley argues, that the officer must have heard Dudley's request and was prohibiting her from carrying it out.

Agent Fife, who was a member of the entry team, testified that he did not hear Dudley say anything as he first made contact with him upon entering the apartment.[11]  And Agent Conley, who was also a member of the entry team and who was present on the landing when Dudley was removed from the apartment, testified that he never heard Dudley say anything about an attorney.

In considering all the evidence presented and making credibility determinations, the district court concluded that there was no evidence the officers had heard Dudley's request to his wife.  And the evidence shows that -- crediting that Dudley made this statement -- it nonetheless would have been made in the chaos of the initial protective sweep, as ten officers, with their guns in the low and ready position, moved quickly through the front door trying to secure the apartment.

Taken as a whole, we find that the evidence supports the district court's findings, and, as such, we find no clear error. See Camacho, 661 F.3d at 723 ("[W]e 'will uphold a denial of a motion to suppress if any reasonable view of the evidence supports it.'" (quoting United States v. Mendez-de Jesus, 85 F.3d 1, 2 (1st Cir. 1996))).  "[W]hen 'the district court chooses to draw a

_____

[11] Agent Fife acknowledged that he may have been branching off into another area by the time Dudley passed his wife at the door.

- 13 -

reasonable (though not inevitable) inference from a particular combination of facts,' that inference is entitled to respect." Hughes, 640 F.3d at 434 (quoting United States v. Espinoza, 490 F.3d 41, 46 (1st Cir. 2007)). This is especially true where, as here, "evaluations of witnesses' credibility are concerned" since we must be especially deferential to the district court's credibility findings. United States v. Nee, 261 F.3d 79, 84 (1st Cir. 2001) (quoting United States v. Jones, 187 F.3d 210, 214 (1st Cir. 1999)).

Finding no clear error in the district court's findings, our inquiry is a simple one. If no officer heard Dudley's statement to his wife, it could not have been a clear invocation of his right to counsel. "[T]his is an objective inquiry," Davis, 512 U.S. at 459, and officers could not have objectively understood a statement they did not hear to be an assertion of the right to counsel.

But even assuming the entry team officers heard Dudley's request to his wife as they moved through the apartment, such a request simply "does not unequivocally demand assistance, request the lawyer's presence, or otherwise clearly indicate an unwillingness to make a statement absent presence of an attorney." United States v. Oquendo-Rivas, 750 F.3d 12, 19 (1st Cir. 2014). Under the Davis standard, Dudley had to "articulate his desire to have counsel present sufficiently clearly that a reasonable police

officer in the circumstances would understand the statement to be a request for an attorney." Davis, 512 U.S. at 459. Telling his wife "to call Gordon to get ahold of Joseph about the -- about getting a lawyer," is not sufficiently clear to adequately inform officers whether or not Dudley wanted an attorney present for subsequent questioning.[12] See Grant-Chase v. Comm'r, N.H. Dep't of Corr., 145 F.3d 431, 436 (1st Cir. 1998) (finding reasonable a state court's determination that a pre-Miranda request to call a lawyer was "ambiguous as to purpose" because it was unclear whether the suspect sought "the assistance of an attorney in dealing with the forthcoming interrogation" and concluding that in the face of such ambiguity officers were "within their rights" "to continue the interrogation without asking for clarification"); United States v. Fontana, 948 F.2d 796, 806 (1st Cir. 1991) (suspect's instruction to his wife to call an attorney -- made while in the presence of an officer -- was not a reassertion of the right to counsel); cf. Obershaw v. Lanman, 453 F.3d 56, 65 (1st Cir. 2006) (suspect inquiring "whether he could talk to a lawyer, rather than expressly asserting that he in fact wanted to do so" was not an unambiguous request for counsel). Accordingly, we conclude that Dudley's request to his wife that she "call Gordon" was not an unambiguous invocation of his right to counsel.

---

[12] We note that Dudley made no incriminating statements until after he received the Miranda warnings.

## 2. Dudley's Other Alleged Requests for Counsel

As for Dudley's alleged requests for counsel before and during his interrogation in Agent Fife's SUV, Dudley argues that the district court committed clear error in finding that Dudley never invoked this right.  At the suppression hearing, both Agents Fife and Conley testified that Dudley never mentioned an attorney. Agent Fife further testified that Dudley never asked to stop the interview.   And while Dudley did testify that he requested a lawyer, he also testified that he understood his rights and was "quite protective" of them (indeed he testified that he knew to ask to see the search warrant and to use the phrase "probable cause" when challenging his arrest), but that he nevertheless continued answering the officer's questions after allegedly invoking his right to counsel on three separate occasions.

The district court did not find this testimony credible,[13] "deem[ing] it unlikely that the defendant would have

---

[13] Highlighting minor inconsistencies in the agents' testimony (e.g., differences among the agents as to when, or if, Dudley's interview was interrupted by Agent Cote), Dudley argues that it was clear error for the district court to find Dudley's testimony unreliable because his testimony, as opposed to the agents, "was comprehensive and unwavering."  Dudley also argues that because the agents admittedly did not consider Dudley to be in custody, "his asking for an attorney was not perceived as invoking his right to counsel under Miranda and therefore [was] more forgettable to the agents."  These arguments go nowhere as the district court explicitly noted a number of these same inconsistencies when making its credibility determinations.  For example, the district court noted the discrepancies surrounding Agent Cote's disruption of the interview, but unambiguously credited Agent Fife's testimony while

proceeded to answer the officers' questions had he invoked his right to an attorney." Rather, the district court found it likely that Dudley chose to continue answering questions "because he perceived an advantage, or at least no harm, in doing so." This credibility determination was reasonable and was well within the trial court's purview. As such, we will not second-guess the district court's findings. See United States v. McGregor, 650 F.3d 813, 820 (1st Cir. 2011) ("Clear-error review is highly deferential, requiring us to let the judge's fact-sensitive conclusions and credibility calls stand unless we are left with a definite and firm conviction that the judge made a mistake.").

The district court's conclusion that Dudley never unambiguously invoked his right to counsel was not clearly erroneous. Accordingly, the motion to suppress was properly denied. See Davis, 512 U.S. at 462 ("Unless the suspect actually requests an attorney, questioning may continue.").

## II. Dudley's Evidentiary Challenge

Dudley next argues that the district court committed reversible error by permitting the government to play two thirty-second video excerpts depicting child pornography for the jury in violation of Federal Rule of Evidence 403.

---

noting that nothing turned on the distinction. The evidence adequately supports the district court's findings.

## A.  Standard of Review

We review the district court's Rule 403 determination for abuse of discretion.  United States v. Mangual-Corchado, 139 F.3d 34, 43 n.22 (1st Cir. 1998).  Under the rule, "court[s] may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  But "this rule protects defendants only against evidence that would produce unfair prejudice, as '[b]y design, all evidence is meant to be prejudicial.'"  United States v. Breton, 740 F.3d 1, 14 (1st Cir. 2014) (emphasis and brackets in original) (quoting United States v. Varoudakis, 233 F.3d 113, 122 (1st Cir. 2000)).  And "[w]e give great deference to a district judge's balancing of probative value versus unfair prejudice."  Id.

## B.  The Video Excerpts

Prior to trial on the possession matter, Dudley filed a motion in limine offering to stipulate that the CDs found in his home contained child pornography as defined by federal law, and thus, sought to preclude the government from showing the jury any images of child pornography. Alternatively, Dudley sought to limit publication to one image and/or to limit the image, or images, to those that were "less inflammatory," such as "those depicting children in sexually suggestive poses" rather than, for example, an image of "adults sexually abusing children."  Dudley also sought

- 18 -

to limit the images to show only the bodies of the children because "[t]he expressions on the faces of the children who are being abused are heartbreaking and [would] most certainly inflame the passions of the jury."

For its part, the government sought to introduce three videos (out of approximately one hundred) from the DVDs found in Dudley's office[14] and to play a thirty-second clip from each for the jury. The first two videos were approximately twelve and fifteen minutes long, respectively, and depicted sexual activity between adults and children.[15] The forensic evidence showed that both of these videos had been opened using the password-protected laptop computer seized from Dudley's bedroom. The third video, which the government ultimately chose not to play for the jury, was over two minutes long and also showed explicit images of children. That video had been shared from Dudley's IP address and downloaded by Agent Conley during the course of his investigation. In opposing Dudley's motion, the government argued that: (1) it was not obligated to accept Dudley's stipulation and was "entitled

---

[14] Evidence showed that a similar Phillips DVD was found in Dudley's office containing church-related materials. During his interrogation with Agents Fife and Conley Dudley had claimed to be a pastor and said that he held weekly services in his apartment.

[15] These video files were titled: "pthc -- open -- euro family young sex education very young girl a.mpg" and "(pthc) compilation (sex bj cum).wmv". The third video was titled: "(pthc) 8yr mom rubbs daughter.mpg".

to prove its case by evidence of its own choice"; (2) the nature of the videos was relevant to issues of knowledge and lack of mistake that the videos were child pornography; and (3) introduction of those particular videos (along with the forensic evidence) would "demonstrate the unlikelihood that the videos were present in [Dudley's] apartment without his knowledge."

After viewing the challenged videos (and proposed excerpts) and conducting its Rule 403 balancing, the district court concluded that Dudley's "requested limitations would limit the probative value of the proffered evidence while doing little to nothing to limit the prejudicial impact," which the district court noted was "not unfair prejudice in any event."  In the district court's assessment, the government was entitled to present a limited number of images to meet its burden to prove -- not just possession -- but knowledge and lack of mistake.  The district court further determined it could not force the government to accept Dudley's offer to stipulate "[b]ecause the images [were] part of the Government's narrative and probative on multiple elements of the offense."

In the end, two (of three) videos were admitted during the government's case-in-chief, and two thirty-second excerpts were played for the jury during the government's closing argument.

## C. Discussion

On appeal, Dudley argues that the district court committed reversible error when it permitted the government to play these thirty-second excerpts of child pornography to the jury because the -- admittedly "disturbing" -- videos created a risk of unfair prejudice that far outweighed the probative value. Finding no abuse of discretion, we affirm.

Acknowledging that "the prosecution is entitled to prove its case by evidence of its own choice and is not required to accept a defendant's offer to stipulate," see Old Chief v. United States, 519 U.S. 172, 183 (1997) ("[A] defendant's Rule 403 objection offering to concede a point generally cannot prevail over the Government's choice to offer evidence showing guilt and all the circumstances surrounding the offense."), Dudley nevertheless argues that his willingness to stipulate that the images on the disks were child pornography lessened the probative value of the videos to such an extent that it was reversible error for the district court to allow them to be played -- no matter how brief the excerpt.[16] Although Dudley was willing to stipulate to

---

[16] Dudley relies on United States v. Merino-Balderrama, 146 F.3d 758 (9th Cir. 1998) and United States v. Cunningham, 694 F.3d 372 (3d Cir. 2012) to argue that it was reversible error to play the video excerpts to the jury given Dudley's willingness to stipulate. But those cases are easily distinguishable. In Merino-Balderrama, the government offered no direct or circumstantial evidence that the defendant ever saw the films -- only the box covers. 146 F.3d at 762-63. As such, the court concluded that

- 21 -

the content of the DVDs, however, he consistently denied knowledge, maintaining that he did not know what was on the disks and that he had never accessed the files. Consequently, his proposed stipulation only went so far. See United States v. Eads, 729 F.3d 769, 778 (7th Cir. 2013) ("A stipulation about the content of charged images only goes so far if it is silent with respect to the defendant's knowledge of the images in his possession.").

Framing these issues for the jury at opening, defense counsel queried "[w]ho was in possession, who was in knowing possession," and noted: "the Government references knowing possession of the diskettes and that's all this case is about." Defense counsel explained to the jury that the evidence would show Dudley ran a computer salvage operation and that he had "lots of computers . . . lots of hard drives . . . and all kinds of different ways in which one could come into possession of computer material . . . ." Given Dudley's salvage business, defense counsel emphasized Dudley's "disavow[al] that all of this stuff is his,"

---

the films were less probative of scienter than were their covers. Id. at 762. The court's decision in Cunningham largely turned on the fact that the district judge had not personally examined the videos before deciding to admit them under Rule 403. 694 F.3d at 388 (explaining that "because the District Court abused its discretion when it decided not to watch the videos before admitting them under Rule 403, its underlying Rule 403 determination is not entitled to the full range of deference that we would normally give to it on appeal").

concluding "if you don't do something intelligently, if you don't do something voluntarily, you do something because of either mistake or accident or error, you're not knowingly in possession of that item."

Despite Dudley's proposed stipulation, then, it seems clear that the government would have retained the burden to prove that Dudley had knowingly possessed child pornography and, therefore, "showing the images served a valid, non-cumulative, purpose." Eads, 729 F.3d at 778. The videos provided evidence that anyone who played those files for just thirty seconds -- files that had been opened and played on Dudley's password-protected laptop -- would have known that the videos contained child pornography, thus making it more probable that Dudley knowingly possessed child pornography.

The government offered the clips, along with forensic evidence that the graphically-titled files were downloaded and played on Dudley's computer and that the same password-assigned user had searched the Ares program for keywords typical of child pornography (e.g., "teen sex," "family sex," "inzest," "kids having sex," "voyeir young girls," and "daughter sex"), to prove Dudley's knowledge and lack of mistake or accident. Indeed, before playing the excerpts,[17] the prosecutor explained that he was going

_____

[17] Dudley further claims that the risk of unfair prejudice was "maximized" because the clips were played during the closing

- 23 -

to show "the very first 30 seconds" of the two videos so that the jury could consider if there was any question in their minds whether someone who accessed the DVD, opened the file, and saw just the very first seconds "would know that these videos constituted child pornography and that the possessor of those DVDs was knowingly possessing child pornography."  And the government specifically cautioned that although the jury "had to see a very short excerpt from these videos" to "appreciate what it was," they should not make "a decision based on raw emotion or because [they] view these videos as being evil."

While "[t]he trial judge's job is to avoid unfair prejudice," the district court "is not required to scrub the trial clean of all evidence that may have an emotional impact." United States v. Morales-Aldahondo, 524 F.3d 115, 120 (1st Cir. 2008).

---

argument, immediately before the jury was asked to deliberate. The government counters that this argument was waived because, although Dudley objected to the publishing of the videos, he did not specifically object to the videos being played during the prosecution's closing.  Indeed, when the prosecutor explained that he planned to show the videos during his closing, defense counsel stated that this procedure was "[f]ine."  In any event, this argument need not detain us long, since even assuming, favorably to Dudley, that the argument was not waived, the distinction is not determinative.  Watching these videos was no doubt incredibly difficult whether they were viewed at the end of the first trial day (with a full night to dwell on them) or during the closing and "from the vista of a cold appellate record" we cannot say that the difference necessarily tips the scales in Dudley's favor.  United States v. Dowdell, 595 F.3d 50, 74 (1st Cir. 2010) (noting that "[t]he trial court has wide latitude in determining when the amount of unfair prejudice has tipped the scale too far").

Here, the judge viewed the videos, and the proposed excerpts, and "properly balanced the competing concerns of Rule 403" in denying Dudley's objection to showing the video excerpts to the jury.  Id. The video excerpts (in combination with the forensic evidence) were probative of whether Dudley knowingly possessed child pornography and rebutted Dudley's defense that he mistakenly acquired the DVDs.  We see no reversible error.

### THE PERJURY MATTER

As the reader may recall, after testifying at the suppression hearing in the possession matter, Dudley was charged by indictment with one count of false declaration before the court, stemming from statements he made under oath that he had invoked his right to an attorney.  Here, Dudley challenges the district court's denial of his motion for judgment of acquittal in the perjury matter, arguing that the government "did not prove beyond a reasonable doubt that his statements were false, nor did it prove that [he] knew they were false at the time he made them."  After review, we affirm.

## I.    Sufficiency of the Evidence

### A.    Perjury Trial

A jury trial was held in the perjury matter.[18]  Special Agents Fife and Conley testified, as did Dudley's wife, Lori.  In

---

[18] Since Dudley attacks the sufficiency of the evidence in the perjury matter, we recite the relevant facts in the light most

- 25 -

brief, Agents Fife and Conley testified to the events surrounding the search of Dudley's residence and the subsequent interrogation of Dudley in Agent Fife's SUV.  The agents testified that at no time -- upon entry to the apartment, before the interrogation or during -- did Dudley ask to speak with a lawyer.  Agent Fife also explained that he, Agent Conley, and Dudley had all testified at the April 5, 2012 suppression hearing.  Portions of the suppression hearing transcript were then admitted into evidence.

At the close of the government's case-in-chief, the district court denied Dudley's motion for judgment of acquittal, rejecting Dudley's two arguments:  (1) that the indictment (specifically paragraph four)[19] required the government to prove

---

favorable to the verdict.  See United States v. Alverio-Meléndez, 640 F.3d 412, 416 n.1 (1st Cir. 2011).

[19] The indictment provides, in relevant part:

3. At the time and place alleged, JOEL DUDLEY, while under oath, knowingly declared before the Court . . . as follows . . .

> Q: No, sir, I'm asking on August 20th how many times are you telling this Court that you told them you wanted a lawyer?
> A: *Three.*
> Q: Three separate occasions.
> A: *Yes.*
> Q: Prior to being interviewed and during the interview.
> A: *Yes.*
> Q: You told them you wanted a lawyer.
> A: *Yes, I did.*

- 26 -

that Dudley did not invoke his right to counsel at any point -- not just during the interrogation with Agents Fife and Conley -- and the government's failure to call the other officers on the entry team rendered the evidence insufficient; and (2) that evidence of materiality was insufficient because if, as Agents Fife and Conley testified, Dudley was not in custody, whether he invoked his right to counsel was immaterial. Denying the motion, the district court concluded that the indictment "refers to Conley and Fife throughout" and that "even if [Dudley] had asked for lawyers at other times, if he testified falsely deliberately as regards to what he told Fife and [Conley], the Government is safe as far as the motion is concerned." Regarding the materiality issue, the district court found that the statement was material because "it was intended to be material as of the time the statement was made."

After Dudley's sufficiency motion was denied, Lori testified for the defense. Lori stated that as the officers entered the apartment, Dudley told her to "call Higgins, his

---

Q: And your testimony under oath today is that they basically ignored that and continued to question you; is that correct?
A: *Yes, that is correct.*

4. The italicized testimony of JOEL DUDLEY, as he then and there well knew and believed, was false in that DUDLEY did not invoke his right to counsel or otherwise tell investigators he wanted a lawyer at any time prior to or during the August 20, 2012 interview.

lawyer." Lori testified that she was in the living room and that Dudley was in the hallway when this request was made, but despite that distance she confirmed that Dudley did not "yell" this request. After Lori testified, the defense rested. Dudley did not renew the motion for judgment of acquittal at the end of his case. The case was then submitted to the jury, and Dudley was found guilty. Dudley did not renew his motion for acquittal after the guilty verdict.

**B.  Discussion**

As a threshold matter, we note that Dudley's failure to renew his motion for judgment of acquittal at the close of the entire case (after offering evidence in his defense) and following the guilty verdict, constitutes a waiver of his motion. See United States v. Maldonado-García, 446 F.3d 227, 230 (1st Cir. 2006) (noting that failure to renew a motion for acquittal at the close of all evidence or following a jury verdict constitutes a waiver of an earlier motion). Therefore, we review for "clear and gross injustice" only.[20] Id. Finding none, we affirm.

_____

[20] The government also argues that Dudley waived specific sufficiency arguments raised on appeal by failing to raise them below. See United States v. Foley, 783 F.3d 7, 12 (1st Cir. 2015) ("Under our precedent, although a general sufficiency-of-the-evidence objection preserves all possible sufficiency arguments, a motion raising only specific sufficiency arguments waives unenumerated arguments."). But given our broader conclusion as to waiver, we need not determine whether (or not) Dudley's sufficiency arguments below preserved his appellate arguments. See id. (noting

- 28 -

To evaluate Dudley's challenge, "we consider whether a rational jury could have concluded that the government proved each element of the charged offenses beyond a reasonable doubt." United States v. Morales-Machuca, 546 F.3d 13, 20 (1st Cir. 2008). "In so doing, we view the evidence in the light most favorable to the jury's guilty verdict and 'resolve all questions of credibility and reasonable inferences in favor of the verdict.'" Id. (quoting United States v. Lizardo, 445 F.3d 73, 81 (1st Cir. 2006)).

"A statement under oath constitutes perjury if it is [1] false, [2] known to be so and [3] material to the proceeding." United States v. Pagán-Santini, 451 F.3d 258, 266 (1st Cir. 2006) (citing 18 U.S.C. § 1623). On appeal, Dudley asserts there was insufficient evidence as to the first two elements -- falsity and knowing falsity. Viewing the record in the light most favorable to the verdict, however, we think that a rational jury could have found Agents Fife's and Conley's testimony, that Dudley at no time requested an attorney, more credible than Dudley's contradictory suppression hearing testimony.

In addition to testifying that Dudley never requested an attorney, Agent Fife testified that Dudley: (1) asked to see the search warrant; (2) was read his Miranda warnings; and (3) affirmed that he "understood his rights." Still, Agent Fife further

"that a general sufficiency objection accompanied by specific objections [may] preserve[] all possible sufficiency objections").

testified that Dudley continued to talk to the officers for approximately forty minutes (despite Dudley's testimony that he had repeatedly invoked his right to counsel). Agent Conley's testimony largely mirrored Agent Fife's testimony, and Agent Conley emphasized that he was "100 percent certain" that Dudley did not ask for a lawyer at any point during Agent Conley's interactions with him. From this, the jury reasonably could have concluded -- much like the district court in the possession matter -- that it was unlikely Dudley would have continued answering the officers' questions for forty minutes if he had in fact invoked his right to counsel. In other words, the jury reasonably could have concluded that Dudley's unequivocal suppression-hearing testimony -- that "prior to being interviewed and during the interview" he invoked his right to counsel but that these invocations were simply ignored by Agents Fife and Conley -- was knowingly false.

Finally, Dudley argues that the evidence was insufficient to prove that Dudley never requested counsel <u>prior</u> to his interview with Agents Fife and Conley (i.e., his request to his wife), and, therefore, the government has not meet its burden to prove that Dudley knowingly made a false statement to the court. But the indictment clearly referred to Dudley's testimony that he had invoked his right to counsel during his interrogation by Agents Fife and Conley. Specifically, the indictment concerned "whether

[Dudley] had invoked his right to counsel during an interview with law enforcement."

In sum, the jury had sufficient bases to convict Dudley of false declaration before the court, in violation of 18 U.S.C. § 1623(a), and finding no "clear and gross injustice," we affirm.

**CONCLUSION**

For the reasons articulated above, we affirm Dudley's convictions.

**Affirmed.**