# United States Court of Appeals
## For the First Circuit

Nos. 23-1496, 23-1497

UNITED STATES OF AMERICA,

Appellee,

v.

JOEL DUDLEY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Rikelman, Lynch, and Howard,
Circuit Judges.

Luke Rosseel, with whom Rosseel Law was on brief, for appellant.
Brian S. Kleinbord, Assistant United States Attorney, with whom Darcie N. McElwee, United States Attorney, was on brief, for appellee.

April 29, 2024

**LYNCH**, **Circuit Judge**.  Appellant Joel Dudley challenges the 2023 revocation of his supervised release and his sentence of two terms of two years of incarceration, to be served consecutively, followed by supervised release for life.  The revocation at issue is the second revocation from his prior convictions in 2014 for possession of child pornography and making a false declaration before the court.  See United States v. Dudley, 804 F.3d 506, 509 (1st Cir. 2015).  This revocation was based on the district court's finding that he had violated five conditions of his supervised release, including by sharing images of himself sexually abusing his daughter C.D. when she was approximately four years old and engaging in sexual contact with, exchanging sexually explicit messages with, and receiving and possessing a pornographic video of C.D. when she was seventeen years old.  We hold that the district court judge did not err or abuse his discretion in revoking Dudley's supervised release and that Dudley's sentence is procedurally and substantively reasonable and affirm.

**I.**

We "must interpret the evidence in the light most favorable to the government" when reviewing a finding that a defendant has violated the terms of his supervised release under the clear error standard.  United States v. Oquendo-Rivera, 586 F.3d 63, 67 (1st Cir. 2009).

## A. 2014 Original Criminal Conviction

In August 2012, agents from U.S. Homeland Security Investigations (HSI) found two CDs containing child pornography at Dudley's residence in Westbrook, Maine, while executing a search warrant based on information that someone at that address was sharing child pornography files online. Dudley, 804 F.3d at 508-09. In an interview with the HSI agents, Dudley admitted to downloading 500-600 child pornography videos. When asked "whether he had ever videotaped or photographed local children," Dudley "stated that he had taken a picture of his daughter in the bathtub" and "that he had made the picture a 'hidden' file on his computer." He was arrested and indicted on one count of possession of child pornography. Id. at 509. Before trial, Dudley filed a motion to suppress statements he made to the HSI agents. Id. He testified at the hearing on his motion. Id. The district court denied the motion, and the government further charged Dudley with one count of making a false declaration before the court based on his testimony at the suppression hearing. Id.

Dudley was found guilty on both counts at two separate jury trials. Id. Although the guideline range was 235 to 293 months, the district court sentenced him to a lesser total combined sentence of ninety-six months, followed by ten years of supervised

- 3 -

release,[1] after expressing the concern that a long prison sentence would leave a then-young Dudley "hardened to [his] prior conduct" and that it "may well increase the likelihood of recidivism." Dudley appealed, contesting the district court's denial of his motion to suppress in the possession matter and arguing that the court erred by allowing the government to play two short video excerpts obtained from Dudley containing child pornography for the jury during the trial. Id. at 508, 515-16. This court affirmed his conviction, rejecting both arguments. Id. at 515, 518, 520.

On April 20, 2019, Dudley was sent to a residential reentry center ("RRC") in Portland, Maine, to finish serving his initial period of imprisonment. Dudley was returned to the Bureau of Prisons after RRC staff seized from him a cell phone containing two images of nude prepubescent minors and a typed document describing in graphic detail Dudley sexually abusing his three minor daughters.

**B. 2019 First Supervised Release**

On July 19, 2019, Dudley was placed on supervised release. Within two months he violated the conditions of his release by failing to update his sex offender registration, as

---

[1]    This sentence was imposed for Dudley's possession of child pornography conviction. He was also sentenced to sixty months imprisonment followed by three years of supervised release on his perjury conviction, to be served concurrently with the possession conviction.

required under the Sex Offender Registration and Notification Act, and having other individuals access the internet on his behalf in violation of the Computer and Internet Monitoring Program. Based on this information, Michael Barker, Dudley's probation officer at the time, filed a petition to revoke Dudley's supervised release on September 23, 2019. Barker testified that Dudley's ex-wife had told him that Dudley had attempted to contact their daughter C.D., then age fourteen, while at the RRC in order to get her to "meet up" with him, even though Barker had informed Dudley that he was not allowed to have any face-to-face contact with his minor children. Barker also testified that a Department of Health and Human Services investigation was "able to substantiate that Mr. Dudley abused his daughter by forcing her to watch child pornography." Dudley's supervised release was revoked at a November 13, 2019, hearing, and he was sentenced to fifteen months in prison followed by ten years of supervised release.

## C. 2020 Second Supervised Release

On October 16, 2020, Dudley was once again placed on supervised release after serving this additional sentence. On September 12, 2022, Dudley's new probation officer Kate Phillips petitioned to revoke his supervised release for the second time after learning that Dudley had unapproved contact with C.D., then age seventeen; had exchanged sexually explicit messages with her; and had been using an unreported cell phone number and Facebook

account under a false name. On the morning of September 12, 2022, Dudley informed Phillips that C.D. had spent the night with him in his camper after she had a violent altercation with her mother. Also on September 12, 2022, C.D.'s mother showed Phillips messages on C.D.'s cell phone that Dudley had sent to C.D. via Facebook Messenger under the alias "John Smith" using an unreported cell phone. In these messages, which date to as early as September 8, 2022, Dudley discussed viewing inappropriate sexual photos and videos of C.D. and his desire to engage in digital penetration, oral sex, and intercourse with his daughter.

On September 14, 2022, after learning that Dudley had instructed his then-girlfriend Roxann Arnett to give C.D. his unreported cell phone, law enforcement authorities recovered the cell phone from C.D. The cell phone was logged into two Facebook accounts, one belonging to "John Smith," which was linked to the sexual messages. Also on September 14, 2022, officers from the probation office and HSI searched Dudley's camper, truck, and primary residence and discovered additional unreported electronic devices, including a tablet.

On January 5, 2023, Phillips filed an amended petition to revoke Dudley's supervised release. The amended petition charged Dudley with additional violations after a forensic examination of Dudley's and C.D.'s cell phones revealed a video of a minor who appeared to be C.D. masturbating, and reports by a

- 6 -

cooperating witness ("CW") revealed that Dudley had shown the CW images of himself sexually abusing C.D. as a young child in March 2022, and that the CW had witnessed Dudley engaging in inappropriate sexual contact with C.D. in April 2022.

### D. 2023 Revocation Challenged on Appeal

Dudley's revocation hearing took place on June 5, 8, and 12, 2023. The CW testified on June 5, 2023, as described below. The CW and Dudley had become friends while they were participating in a sex offender treatment group in Maine in 2021. At the time of the hearing, the CW had pled guilty in the Maine federal district court to one count of possession of child pornography and had signed a cooperation agreement with the government, and he testified in the hope of receiving a lesser sentence for this crime.

In the spring of 2022, Dudley showed the CW photos stored in a "locked," password-protected file on his tablet which depicted Dudley sexually abusing C.D. when she was approximately four years old. Dudley told the CW "the story about what he was doing" as he showed him "[e]ach picture." Dudley also told the CW to take his electronic devices for him "when his probation officer would show up" so that she wouldn't find the images. Later that spring, the CW went to the Maine Mall with Dudley. The men went inside the mall, met C.D., and then all three returned to Dudley's van. In the van, Dudley "started touching [C.D.]'s breasts" and "put his

hand underneath her dress and said, oh, I don't see no underwear on you." C.D. then "said my mom went and took me and put me on birth control," and Dudley said, "oh, okay." At that point, the CW left the van and waited outside for half an hour. When the CW returned, C.D. left the van. The CW asked Dudley "did you have fun," and Dudley "said[] yeah."

Dudley testified in his own defense at the revocation hearing and denied that he possessed the unreported cell phone or tablet, claiming they were exclusively used by Arnett for their business, although admitting the cell phone was registered in his name. Dudley denied that he used the "John Smith" Facebook account to contact C.D. but admitted that he attempted to contact C.D. through Facebook Messenger before his probation conditions prohibited such contact and that he did not receive a reply. He also denied that he had ever shown the CW child pornography or engaged in sexual activity with any minors, including his daughter.

On June 12, 2023, the district court found that the government had proven by a preponderance of the evidence that Dudley had violated five conditions of his supervised release.[2]

---

[2] In addition to the violations Dudley contests on appeal, the court found that Dudley had violated the conditions of his supervised release by having unapproved contact with a minor (C.D.), using and possessing unapproved electronic devices, failing to update the State of Maine Sex Offender registry about his employment change within three business days, operating a vehicle without a valid driver's license and resisting arrest, communicating with a felon without prior permission, and testing

During sentencing, Dudley allocuted on his own behalf and stated "whatever [the CW] has said about me is a lie" and "I don't know anything about the John Smith texts." The court revoked Dudley's supervised release for the second time and sentenced him to the statutory maximum of two terms of two years of incarceration to be served consecutively, followed by supervised release for life.[3]

Dudley timely appeals, challenging the court's findings that he had shown child pornography to the CW in violation of 18 U.S.C. § 2252A(a)(5)(B) (a Grade A violation), that he had engaged in sexual contact with C.D. in his van in violation of Me. Stat. tit. 17-A, § 260(1)(G) (a Grade C violation), and that he had received and possessed child pornography of seventeen-year-old

_____

positive for marijuana. He does not challenge these findings on appeal.

[3] The maximum prison term that a court may impose at supervised release revocation is set forth in 18 U.S.C. § 3583(e)(3) and is based on the class of the defendant's underlying offense. 18 U.S.C. § 3583(e)(3). Dudley was convicted under Docket 2:13-CR-116 of a Class D felony and Docket 2:13-CR-04 of a Class C felony, and accordingly could be sentenced to up to two years imprisonment on each docket. Under 18 U.S.C. § 3583(h), the court may also impose a term of supervised release to follow imprisonment after revocation. 18 U.S.C. § 3583(h). For Docket 2:13-CR-116, the maximum term of supervised release that could be imposed was twenty-one months, less the term of imprisonment imposed for the revocation, and for Docket 2:13-CR-04, the maximum term of supervised release that could be imposed was life.

C.D. on his unreported cell phone in violation of 18 U.S.C. §§ 2252A(a)(2)(A) and (5)(B) (a Grade A violation).

**II.**

"We review the district court's ultimate decision to revoke supervised release for abuse of discretion, and the underlying finding of a violation of supervised release for clear error." United States v. Wright, 812 F.3d 27, 30 (1st Cir. 2016). Clear error is an "'exceedingly deferential'" standard of review, and a reviewing court "will not 'disturb either findings of fact or conclusions drawn therefrom unless the whole of the record compels a strong, unyielding belief that a mistake has been made.'" United States v. Munera-Gomez, 70 F.4th 22, 34 (1st Cir. 2023) (quoting United States v. Matos, 328 F.3d 34, 39-40 (1st Cir. 2003)).

**A.**

The district court did not clearly err in finding that Dudley had violated his supervised release based on the evidence presented and did not abuse its discretion in revoking his term of supervised release. First, the court did not clearly err by crediting the CW's testimony. "[I]t is always permissible for a judge, acting in his capacity as a factfinder, to use his knowledge and experience to assess the credibility of witnesses and to evaluate the evidence." United States v. Teixeira, 62 F.4th 10, 19 (1st Cir. 2023). Credibility determinations may be reversed

only when the reviewing court is "definitely and firmly convinced that a mistake has been made." United States v. Mendoza-Maisonet, 962 F.3d 1, 16 (1st Cir. 2020) (quoting United States v. Oquendo-Rivera, 750 F.3d 12, 16 (1st Cir. 2014)). While a credibility determination may be clearly erroneous where "objective evidence . . . contradict[s] the witness'[s] story; or the story . . . [is] internally inconsistent or implausible on its face," Oquendo-Rivas, 586 F.3d at 67 (quoting Anderson v. City of Bessemer, 470 U.S. 564, 575 (1985)), a credibility determination based on live testimony that is "not internally inconsistent, can virtually never be clear error," United States v. Rivera-Carrasquillo, 933 F.3d 33, 42 (1st Cir. 2019) (quoting Anderson, 470 U.S. at 575)), because the district court "judge heard the witnesses from both sides and eyed their manner," id. The record well supports the district court's findings.

Here, the CW's testimony is corroborated by other evidence that Dudley sexually abused C.D. both when she was a young child and a teenager, including C.D.'s aunt's testimony that C.D. had told her that Dudley sexually assaulted C.D. when she was "about eight years old" and "when he got out of jail," C.D.'s written statement that "my father. . . . hurt me as a child and I don't want anything to do with him" (emphasis added), and messages

Dudley sent to his daughter under the alias John Smith,[4] which reference C.D. not remembering "some of the things that we did growing up," and in-person contact between Dudley and C.D. in September 2022.

The CW's testimony is neither inconsistent nor implausible. Dudley has fallen far short of "definitely and firmly convinc[ing]" us "that a mistake has been made." See Mendoza-Maisonet, 962 F.3d at 16 (quoting Oquendo-Rivas, 750 F.3d at 16). Further, Dudley's argument that the CW was motivated to falsely testify against Dudley "to decrease his sentence in his own criminal case" both fails to undermine the credibility finding and is itself implausible. The CW informed his probation officer,

_____

    [4]    While Dudley has repeatedly denied that he sent the John Smith messages, the government provided ample evidence that he did. Dudley used this alias during a phone call with the South Portland Police Department on September 11, 2022, during which he told the police that he was on his way to pick up his daughter, C.D. Phillips also found sexual messages that were from "John Smith" on a tablet recovered from Dudley's property and that were sent from a Facebook account logged into on his cell phone. The verified phone number connected with the John Smith Facebook account was (207) 450-0956, which is the phone number of Dudley's unreported cell phone. Phillips also testified that she had no doubt in her mind that Dudley was the "John Smith" messaging with C.D. and that the messages "indicate a father and daughter relationship." C.D. repeatedly calls Dudley "Dad" in the messages, and Dudley refers to "daddy daughter time", references "pre[y]ing on my daughter," and writes, "[i]f I wasn't your dad I could hit more buttons th[a]n you even know lol." The messages also include references to Dudley's fiancée Arnett and his two former wives, C.D.'s friend, and Dudley's job, and in one message Dudley misspells "choke" as "chock," which is the same misspelling Dudley used in a sexually explicit letter he wrote to C.D.'s friend.

- 12 -

Chuck Grenier, about Dudley showing him the child pornography on his tablet in March 2022, and Grenier shared this report with Phillips on May 11, 2022, before a search warrant for the CW's electronic devices was issued on May 12, 2022, and well before the CW was arrested in July 2022 and signed a cooperation agreement with the government. Because the court's credibility finding was not clearly erroneous, Dudley's argument that "it was an abuse of discretion to revoke supervised release based on" the CW's testimony because a "revocation of supervised release based on [a] clearly erroneous violation finding amounts to an abuse of discretion," also fails.

The district court also did not abuse its discretion by revoking Dudley's supervised release based on the evidence that he had received and possessed child pornography on his cell phone. Dudley argues that only hearsay evidence was offered for this violation, and that by admitting this alleged hearsay "without an adequate excuse for failing to produce the declarant," the court abridged his "limited confrontation right" in a supervised-release revocation hearing. This argument fails even if Dudley had presented it to the trial court, which he did not.[5]

---

[5] Because Dudley raised this issue for the first time on appeal, we would ordinarily review it only for plain error, see United States v. Dávila-Reyes, 84 F.4th 400, 417 (1st Cir. 2023), meaning he must "show '(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the [appellant's] substantial rights, but also (4) seriously impaired the fairness,

Dudley has failed to show any abuse of discretion here. Dudley argues that the revocation petition and report written by Phillips and Phillips' testimony that HSI agents found "numerous videos and images of [C.D.] masturbating" on Dudley's and C.D.'s phones were hearsay statements. He argues these statements were hearsay because Phillips did not testify that she had personally viewed the video on Dudley's cell phone. He also argues for the first time in his reply brief that "there was no cause for relying on the hearsay note that was attributed to [C.D.], rather than the government calling her to testify." Even if these statements were hearsay,[6] the court would not have erred by admitting them. Supervised release revocation hearings are not subject to the

integrity, or public reputation of judicial proceedings.'" United States v. Márquez-García, 862 F.3d 143, 145 (1st Cir. 2017) (alteration in original) (quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001)). Dudley made no effort to argue the plain-error standard in his opening brief, so his claim could be considered waived. See United States v. Ponzo, 853 F.3d 558, 574 (1st Cir. 2017). Despite this, we review this claim because his opening brief did "make apparent his theory of the district court's plain error, and he did squarely address the plain error factors in his reply brief," United States v. Facteau, 89 F.4th 1, 44 n.29 (1st Cir. 2023). "Moreover, '[w]here a defendant's claim would fail even if reviewed for plain error, we have often simply proceeded to the merits.'" Id. (alteration in original) (quoting United States v. Grullon, 996 F.3d 21, 32 (1st Cir. 2021)). Further, because Dudley's claim would fail even if he had not raised it for the first time on appeal, we bypass plain error and review the argument for abuse of discretion.

[6] Defense counsel never asked Phillips for the basis for her knowledge, so the record is silent regarding whether Phillips had personal knowledge from viewing the child pornography video found on Dudley's cell phone herself.

Federal Rules of Evidence.  See Teixeira, 62 F.4th at 17.  Hearsay is admissible if it bears sufficient indicia of reliability, as was true here.  United States v. Franklin, 51 F.4th 391, 396-97 (1st Cir. 2022).  A defendant at a supervised release revocation hearing also "has only a limited right of confrontation, which requires a court to . . . 'weigh both the apparent reliability of the hearsay evidence and the government's proffered reason for not producing the declarant.'"  United States v. Rodriguez, 919 F.3d 629, 635 (1st Cir. 2019) (quoting United States v. Fontanez, 845 F.3d 439, 443 (1st Cir. 2017)).

Because Dudley did not object to this evidence on confrontation grounds before the trial court, the government never had the opportunity to explain why it did not produce the HSI agents, or C.D., and the district court had no reason to engage in the balancing analysis.  Yet the record shows Phillips' statements are supported by sufficiently strong indicia of reliability.[7]  They are highly detailed and are independently corroborated by other evidence, most notably by C.D.'s message to Dudley's "John Smith" account stating, "you just watched a video of me mast[u]rbating,"

---

[7]  Even if the government had offered only a weak explanation, the district court would not have abused its discretion in crediting Phillips' report and testimony.  "In the Rule 32.1(b)(2)(C) context, strong evidence of reliability can counterbalance a weak reason for not producing the declarant." Fontanez, 845 F.3d at 443; see also United States v. Marino, 833 F.3d 1, 6 (1st Cir. 2016).

as well as the CW's testimony and C.D.'s aunt's testimony that Dudley had sexually assaulted C.D. and C.D.'s written statement that her father had "hurt" her and caused her "tra[u]ma and pain." See Franklin, 51 F.4th at 396-97.

Further, Dudley does not dispute the accuracy of C.D.'s written statement (other than claiming its "vague language could apply equally to allegations of emotional abuse as it could to physical abuse"), and a good explanation for why C.D. was not called to testify is evident from C.D.'s aunt's testimony and C.D.'s written statement: the concern that she would not be able to testify truthfully because of pressure from Dudley to lie.

**B.**

Dudley attempts an illogical and ill-conceived argument that the district court judge should have recused himself because he was biased or could be thought to be biased against Dudley based on a ruling the judge had made during the trial that resulted in Dudley's original conviction, which this court affirmed on appeal. See Dudley, 804 F.3d at 516-18. It is difficult to understand how a ruling, affirmed on appeal, could possibly provide any basis for a recusal argument. A recusal decision "is committed largely to the discretion of the trial court, and we review it solely to evaluate whether the decision below amounted to an abuse of discretion." United States v. Giorgi, 840 F.2d 1022, 1034 (1st Cir. 1988). "[A]n abuse of discretion will be found only if a

- 16 -

reasonable reading of the record fails to support the conclusion that the judge's impartiality was not subject to question." United States v. Torres-Estrada, 817 F.3d 376, 380 (1st Cir. 2016) (quoting In re Bulger, 710 F.3d 42, 45 (1st Cir. 2013)). A judge's "alleged bias and prejudice . . . must be personal and it must stem from an extrajudicial source." In re Cooper, 821 F.2d 833, 838 (1st Cir. 1987) (emphasis added). "[L]itigants are not entitled to have a judge disqualify himself merely because they fear an adverse decision." United States v. Cowden, 545 F.2d 257, 265 (1st Cir. 1976). Further, the judge's alleged observation that Dudley was "always playing games with [the] court" "do[es] not constitute disqualifying bias and prejudice" because it was "formed on the basis of the evidence." See Cooper, 821 F.2d at 838.

The district judge also did not, as Dudley contends, express bias or partiality by questioning Dudley during his testimony. Judges have a "well-established" right to "participate actively in the trial proper," United States v. Laureano-Perez, 797 F.3d 45, 70 (1st Cir. 2015) (quoting United States v. Ofray-Campos, 534 F.3d 1, 33 (1st Cir. 2008)), including by "asking questions 'to elicit facts to facilitate a clear presentation of the issues,'" id. (quoting United States v. Meléndez-Rivas, 566 F.3d 41, 50 (1st Cir. 2009)). They "are to be given the 'widest possible latitude' in making judgements about the need to clarify

testimony." United States v. Rosario-Peralta, 199 F.3d 552, 560-61 (1st Cir. 1999) (quoting Rodriguez v. Banco Cent. Corp., 990 F.2d 7, 12 (1st Cir. 1993)). Here, the district court judge's questions were permissible because they "facilitate[d] a clear presentation of the issues," Laureano-Perez, 797 F.3d at 70 (quoting Meléndez-Rivas, 566 F.3d at 50), and "analyze[d], dissect[ed], . . . and comment[ed] on the evidence," United States v. Raymundí-Hernández, 984 F.3d 127, 146 (1st Cir. 2020) (quoting Logue v. Dore, 103 F.3d 1040, 1045 (1st Cir. 1997)). Although Dudley argues that the questions showed bias by "seeking to elicit otherwise unstated inculpatory testimony," "the concern with judicial interrogation is not with 'the damaging truth that the questions might uncover,'" and if the "court's questioning of a witness exposes bad facts, inconsistences, or weaknesses in the case itself, the exposure itself is not . . . worrisome prejudice." United States v. Rivera-Rodriguez, 761 F.3d 105, 113 (1st Cir. 2014) (quoting United States v. Martin, 189 F.3d 547, 554 (7th Cir. 1999)).

## C.

The sentence imposed by the district court is well justified and neither procedurally nor substantively unreasonable.

## 1.

We review Dudley's sentence only for abuse of discretion, a highly deferential standard.[8] Dudley first argues that his sentence is procedurally unreasonable because the CW's testimony should not have been credited, an argument we have rejected. His argument that the district court "fail[ed] to adequately explain the sentence" also fails. The sentence was well explained. "When imposing a supervised release revocation sentence, a district court is obliged to consider the various factors specified in 18 U.S.C. § 3583(e)," a list which

> borrows heavily from the factors enumerated in 18 U.S.C. § 3553(a), and includes the nature and circumstances of the offending conduct; the need to deter further criminal misbehavior; the need to protect the community from "further crimes of the defendant"; and the need to consider the policy statements promulgated by the Sentencing Commission.

---

[8] "Review of the reasonableness of a sentence is for abuse of discretion if the objection was preserved or for plain error if the challenge was raised for the first time on appeal." United States v. Acevedo-Vázquez, 977 F.3d 85, 88 (1st Cir. 2020). Although we would ordinarily review Dudley's procedural error claim for plain error because he failed to argue that his sentence was procedurally unreasonable before the district court, see United States v. Rodriguez-Monserrate, 22 F.4th 35, 40 (1st Cir. 2021), given that his argument fails under both the plain error and abuse of discretion standards, we assume favorably for Dudley that the abuse of discretion standard applies. We also review Dudley's substantive error claim for abuse of discretion because Dudley asked the sentencing court for a lower sentence than he received, thereby preserving his "objection to his sentence on the ground of substantive reasonableness." United States v. Jurado-Nazario, 979 F.3d 60, 64 (1st Cir. 2020).

United States v. Daoust, 888 F.3d 571, 576 (1st Cir. 2018) (internal citations omitted).

The district court fulsomely satisfied all of these criteria. It first stated that it had "reviewed and applie[d] each of the factors set forth in 3553(a)," and "take[n] into account the history and personal characteristics of this defendant," with whom the court had been "involved . . . going back to 2014 and then his first revocation in 2019." The court then stated that "the most important factors" to its decision were "just punishment for what [Dudley] did, the fact that deterrence of this defendant simply does not work, there's nothing that deters his conduct," and the "need to protect the public from this defendant." The court also noted that Dudley had "lied to the Court, both in his testimony and his allocution." Dudley argues that because the court imposed the statutory maximum penalty in each of his two cases, to run consecutively, an effective upward variance from the twenty-four to thirty-month guideline range, see U.S.S.G § 7B1.4(a),[9] "this explanation was inadequate." Not so.

---

[9] U.S.S.G. § 7B1.4(a) provides guideline ranges for imprisonment after revocation of supervised release based on a defendant's violation grade and criminal history category. U.S.S.G. § 7B1.4(a). The most serious violation Dudley was found by the district court to have committed was a Grade A violation. Dudley's criminal history category is IV, which is the criminal history category applicable to him at the time he was originally sentenced to a term of supervision. His guideline imprisonment range was thus twenty-four to thirty months.

"[A]fter considering the relevant sentencing factors," a district court revoking a defendant's supervised release "can sentence the offender to a prison stint within the applicable statutory maximum." United States v. Tanco-Pizarro, 892 F.3d 472, 476 (1st Cir. 2018). Although the court's burden to "explain . . . why it chose a particular sentence . . . . certainly increases the more the court drifts away from the advisory-sentencing range . . . . 'a variant sentence' is often 'based on a complex of factors whose interplay and precise weight cannot . . . be precisely described,'" and in such cases, the court need only "'identif[y] the primary reasons underpinning its decision.'" Id. at 482 (alteration and fourth omission in original) (quoting United States v. Matos-de-Jesús, 856 F.3d 174, 179 (1st Cir. 2017)).

**2.**

Dudley's sentence was also not substantively unreasonable given this fact record, his demonstrated incorrigibility, his recidivism despite being given a lower sentence at his original conviction, and the harm he inflicted on others. In reviewing substantive reasonableness, we consider only "whether the sentence, in light of the totality of the circumstances, resides within the expansive universe of reasonable sentences." United States v. King, 741 F.3d 305, 308 (1st Cir. 2014). Since 2019, Dudley has flagrantly and repeatedly violated the conditions of his supervised release by engaging in prohibited

- 21 -

and sexually inappropriate contact with his own minor daughter, using and possessing prohibited electronic devices to view child pornography, failing to update his registration with the sex offender registry, and consorting with known felons, among other violations.  As the trial judge cogently noted, the prior revocation and incarceration did not deter Dudley in the least from violating the conditions of his supervised release again. Upwardly variant sentences in cases involving egregious violations of supervised release "based on . . . the need to achieve adequate deterrence, to protect the community, and to promote respect for the law" are reasonable.  See United States v. Flores-Quiñones, 985 F.3d 128, 134-35 (1st Cir. 2021) (rejecting challenges to procedural and substantive reasonableness where the appellant demonstrated "repeated and flagrant disrespect for the terms of his supervised release"); see also Daoust, 888 F.3d at 577-78 (affirming an upwardly-variant sentence for a revocation of supervised release as substantively reasonable); Tanco-Pizarro, 892 F.3d at 484 (affirming a sixty-month sentence after revocation as substantively reasonable even though it was "well above the nonbinding range of 6 to 12 months, and right at the statutory maximum").

For the above stated reasons, we **affirm**.